## KPC Corporation v. The Book Press, Inc., et al.

[636 A.2d 325]

No. 92-402

Present: Allen, C.J., Gibson, Dooley and Morse, JJ., and Grussing, D.J., Specially Assigned

Opinion Filed November 5, 1993

*John H. Carnahan* of *Fitts, Olson, Carnahan & Giddings*, Brattleboro, and *Lawrence J. Gebhardt* of *Gebhardt & Smith*, Baltimore, Maryland, for Plaintiff-Appellee.

*Charles N. Hurt, Jr.* of *Downs Rachlin & Martin*, St. Johnsbury, for Defendant-Appellant.

**Gibson, J.** Book Press, Inc. appeals from a judgment in favor of KPC Corporation holding Book Press liable under the terms of its lease with KPC to pay 110% of the basic rent due until the lease expires in the year 2005, and to pay certain sublease net profits. We affirm.

Book Press is a printing company owned by Quebecor America, Inc. In 1980, Book Press contracted with Devon Group, Inc., to lease an industrial building in Brattleboro, Vermont. Subsequently, Book Press sublet a portion of the premises to C & S Wholesalers, and KPC acquired the building subject to the lease and sublease.

Article 22.01(a) of the lease between Book Press and KPC provides in relevant part that an "Event of Default" occurs when "[t]he Tenant shall default in making the payment of any instalment of the Basic Rent . . . and such default shall continue for a period of twenty (20) days." The lease imposes a late charge of 3% on payments made more than ten days after the due date, provides for 12% interest on late payments, and states in Article 22.01:

> [I]f Tenant shall default (i) in the timely payment of Basic Rent or Additional Rent, and any such default shall continue or be repeated for two consecutive months or for a total of four months in any period of twelve months or (ii) more than three times in any period of six months . . . then, notwithstanding that such defaults shall have each been cured within the applicable period . . . any further similar default shall be deemed to be deliberate and Landlord thereafter may either (i) serve . . . 10 days' notice of termination upon Tenant . . . or (ii) by written notice to Tenant, increase the Basic Rent . . . to 110% of the Basic Rent reserved in Article 5 hereof.

Article 5 sets forth the schedule of basic rent due over the term of the lease, showing increases in basic rent due on September 1 of each year beginning in 1986.

Article 17 of the lease requires the landlord's consent for any sublease and requires the tenant to pay "additional rent" to the landlord in the amount of any net profits, after costs and expenses, that the tenant realizes from its sublease. The previous landlord, Devon Group, waived its right to collect net profits from the sublease between Book Press and C & S.

In September 1988, Book Press submitted to KPC for its consent a proposed extension of the sublease to C & S. In granting its consent, KPC expressly reserved its right to receive net profits from the sublease. In December, C & S notified Book Press, but not KPC, that it would move out of the building in March 1989. KPC did not learn of the move until June 1989, at which time it requested payment of net profits from Book Press, which responded that it would not pay net profits because the requirement had been waived.

In September 1989, the rent payment from Book Press was late and for an incorrect amount according to the scheduled increase set forth in Article 5 of the lease. KPC sent a notice of default, and Book Press responded that it had paid the rent and owed nothing further. The rent payment was late again in October and again for an incorrect amount. Incorrect amounts were also paid in November and December. KPC thereupon sent a notice of increase, stating that it was electing to increase the basic rent by 10% as it had a right to do under the lease.

When the rent payment for January 1990 was again remitted for an incorrect amount, KPC commenced this lawsuit. The February rent payment was also incorrect, but later in the month Book Press discovered its mistake and remitted to KPC the amount of increased basic rent it had failed to pay for the preceding months plus a 3% late charge and 12% interest. This payment did not include the 10% increase. KPC pressed its lawsuit on the grounds that Book Press owed it both the 10% increase in basic rent and the net profits from the sublease with C & S.

The trial court found in favor of KPC on both the rent increase and the net profits issues, and Book Press appeals. It contends (1) that KPC waived its right to collect the 10% increase in basic rent when it accepted rent checks for the basic amount, (2) that the 10% increase provision in the lease is unconscionable, and (3) that KPC waived its right to net profits from the sublease when it delayed its demand for payment until after C & S had vacated the premises. We shall consider the waiver issues in turn, then proceed to the issue of unconscionability. The trial court's findings of fact will be upheld unless there has been clear error. V.R.C.P. 52(a)(2); *Cab-Tek, Inc. v. E.B.M., Inc.*, 153 Vt. 432, 434, 571 A.2d 671, 672 (1990).

■ Book Press first contends that the trial court erred in not holding that by accepting rent checks KPC waived its right to increase the rent by 10%. The court made no findings on this issue, but did find that KPC accepted rent checks without waiving its right to net profits. This finding, in addition to the lease provisions, the notice of default of September 1989, and the notice of increase in basic rent of December 1989 clearly support the court's conclusion that no waiver occurred when KPC accepted the rent checks. See *Wells v. Village of Orleans, Inc.*, 132 Vt. 216, 222, 315 A.2d 463, 467 (1974) (despite failure of court to make findings on particular issue, other findings plus record showed that defendant failed to meet its burden of proving affirmative defense).

A waiver is a voluntary relinquishment of a known right. *North v. Simonini*, 142 Vt. 482, 485, 457 A.2d 285, 287 (1983). Book Press relies on the well-settled contract principle that "a term in an executory contract may be waived if one party continues performance under the contract knowing that the other party has failed to perform under the term." *Lemnah v. American Breeders Serv., Inc.*, 144 Vt. 568, 578–79, 482 A.2d 700, 706 (1984). This principle applies, however, only "'in the absence of an assertion of [the nonbreaching party's] intention to retain the rights accruing to him as a result of [the] breach.'" *Id.* at 579, 482 A.2d at 706 (quoting *John B. Robeson Assocs. v. Gardens of Faith, Inc.*, 172 A.2d 529, 533 (Md. 1961)).

The lease between KPC and Book Press provides that if defaults occur, the landlord may choose to increase the basic rent by 10%, "notwithstanding that such defaults shall have each been cured during the applicable period." In Article 31, the lease states: "A receipt by the Landlord of Basic Rent or Additional Rent with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach." KPC's notice of default of September 27, 1989 stated: "Landlord does not waive the defaults, and Landlord hereby reserves and does not waive any remedies . . . including . . . its right to increase the rent . . . ." And, on December 12, 1989, KPC notified Book Press that it was electing to increase the basic rent by 10%, stating: "Notwithstanding . . . any further payments of rent or additional rent, Landlord does not waive the defaults, and Landlord hereby reserves and does not waive any remedies available to it

under the Lease . . . ." The lease and the notices clearly show the intention of the landlord to retain and not to waive its remedies for breach even if it continued to accept rent payments from the tenant.

Book Press nevertheless directs us to cases it claims support the proposition that a landlord waives a right to additional sums when it accepts rent payments for less than the amount claimed to be due. The cases are inapposite, however; they concern the waiver of a landlord's right to terminate a lease or to serve a notice to quit. See, e.g., *Zurmuhlen v. Uchida,* 153 Vt. 165, 169, 569 A.2d 480, 482 (1989) (right to terminate lease was waived when landlord failed to claim forfeiture promptly following breach); *Rosenberg v. Taft,* 94 Vt. 458, 466, 111 A. 583, 586 (1920) (when lessors accepted part payment of rent due, they waived right to forfeiture of lease); *Murphy v. Little,* 69 Vt. 261, 263, 37 A. 968, 968 (1897) (landlord's acceptance of rent payments was accord and satisfaction of disputed rent amounts and operated as waiver of previous notice to quit and of proposed increase in rent). It may be that by accepting rent checks KPC could not have exercised its option to terminate the lease, but that is not what KPC chose to do. More to the point, but no more helpful to Book Press, is our recent decision in *Frangiosa v. Kapoukranidis,* 160 Vt. 237, 244, 627 A.2d 351, 355 (1993), holding that a creditor may accept a check tendered in full payment of a disputed debt, and the acceptance will not operate as accord and satisfaction provided the creditor clearly and explicitly makes it known that the check is not accepted in full payment of the debt. We find no merit to the argument that KPC waived its right to the 10% increase provision by accepting rent checks from Book Press.

Book Press contends also that the trial court erred when it found that KPC did not waive its right to collect net profits from the tenant's sublease to C & S. The right to receive net profits from Book Press's sublease with C & S had been waived by the previous owner of the building, Devon Group. When, as the new owner of the building, KPC consented to the extension of the sublease, it did so with the following express reservation: "The foregoing Consent of Owner shall not be deemed a waiver by Owner of any obligations of Tenant arising under said Net Lease, specifically those referenced in Article 17."

The trial court found no waiver in KPC's consent to the sublease, concluding that, under the terms of Article 17, Book Press owed KPC net profits from the sublease with C & S. The court also held, however, that the original waiver by Devon Group was effective until the original sublease terminated. KPC could therefore collect net profits only for the period September 1, 1988, when the extension took effect, through March 31, 1989, when C & S vacated the building. Book Press argued that it did not owe even these net profits because KPC had waived its right to collect them by waiting too long before demanding payment. Book Press pointed out that KPC did not demand payment of net profits until June 1989, almost nine months after it had consented to the extension of the sublease.

The trial court found that the lease did not require the landlord to demand payment of net profits at any specific time, that the delay by KPC was due to the fact that it did not learn of the termination of the sublease until June, and that it was reasonable in any case for KPC to wait until expiration of the lease. We find no error in the court's conclusion that sublease profits are due for the specified period.

■ The final issue is unconscionability. Where the terms of a lease are plain and unambiguous, they will be given effect and enforced in accordance with their language. *Brownell v. Burlington Fed. Sav. & Loan Ass'n*, 115 Vt. 455, 458, 63 A.2d 862, 864 (1949). Book Press contends that the lease provision allowing the landlord to increase the basic rent by 10% upon default is substantively unfair and that the increase in this case was an unfair surprise. See 9A V.S.A. § 2—302(1) (court may refuse to enforce unconscionable contract or clause).

The trial court found that the terms of the quoted portion of the lease were plain and unambiguous, and that an "event of default" occurred twenty days after Book Press failed to pay the correct basic rent for September 1989. KPC's notice of September 27, 1989 stated that Book Press was in default for "failure to pay basic rent for September 1989, when due, pursuant to Article 5.01." Despite this notice, Book Press continued to pay incorrect basic rent for October, November and December of 1989, and January and February of 1990, and this also constituted default according to the lease. The court con-

cluded that KPC was within its rights when it chose to raise the basic rent by 10% as the lease provided.

Book Press argues that the basic rent increase provision was substantively unfair and that the term is therefore unconscionable. See *Val Preda Leasing, Inc. v. Rodriguez,* 149 Vt. 129, 135, 540 A.2d 648, 652 (1987) (substantively unfair terms support finding of unconscionability regardless of presence or absence of other enumerated factors of unconscionability at formation of contract). We agree with the trial court, however, that *Val Preda* is distinguishable from this case. In *Val Preda,* we held that a car rental agreement was substantively unfair where it appeared on its face to absolve a renter of liability if the renter purchased a "collision damage waiver," but contained on its reverse side a list of exceptions to this waiver so extensive as to virtually nullify the waiver. *Id.* at 132–33, 540 A.2d at 650. We held the agreement unfair because an "average renter would have difficulty in understanding the consequences of the substantial exceptions to the limitation on liability." *Id.* at 135, 540 A.2d at 652.

Here, by contrast, the parties were sophisticated business persons acting with the assistance of able counsel. Indeed, after receiving a notice of default in September 1989, Book Press responded through its attorney that it had paid the rent due, and then proceeded to pay incorrect amounts for the next five months. On these facts, we think *Val Preda* hardly applies.

We likewise find no merit in Book Press's contention that application of the 10% increase provision constitutes unfair surprise. Its argument is based on the fact that KPC's default notice did not refer specifically to the increased basic rent, thereby leading Book Press to believe that default was based only on late payments. In considering whether a party has been unfairly surprised by a contract term or its application, we take into account the party's relative business experience and education, the party's opportunity to understand the terms of the contract, and whether the terms were hidden in the fine print. *Lamoille Grain Co. v. St. Johnsbury & L.C.R.R.,* 135 Vt. 5, 9, 369 A.2d 1389, 1391 (1976).

Although KPC's notice of September 27, 1989 did not literally inform Book Press that it had sent the incorrect amount of rent, the notice clearly directed Book Press's attention to the table in

the lease, at Article 5.01, in which rent increases were set forth. Book Press shared the responsibility to determine the proper rent amount and could easily have done so. Moreover, there had been increases in basic rent in September of each of the preceding three years. We note once again that upon receipt of this notice Book Press chose merely to respond that it was not in default. It is true that in this case a 10% increase in rent over the remaining term of the lease amounts to a considerable sum of money, almost $1.5 million dollars. Nevertheless, the lease has been in existence since 1980, and the increase provision has never been altered. Absent poor education or hidden terms or lack of opportunity to read the lease, none of which are asserted by Book Press, we cannot say that the effect of the provision, however shocking to Book Press, was unfair or a surprise.

Book Press makes a further argument regarding misrepresentations by the president of KPC, and contends that even if we find that sublease profits are due, the maximum amount owed is $18,000. These assertions appear in the brief unaccompanied by facts, law, or reasoning, and therefore need not detain us. See *Bishop v. Town of Barre*, 140 Vt. 564, 579, 442 A.2d 50, 57 (1982) (Court will not search record for errors inadequately briefed). The lease is plain and unambiguous, KPC's consent letter is equally plain, and we find no error in the trial court's calculation of the net profits owing to KPC.

*Affirmed.*