## State of Vermont v. John J. Read

[680 A.2d 944]

No. 95-023

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed March 22, 1996

*William D. Wright,* Bennington County State's Attorney, and *Marcia J. Moss* and *John T. Lavoie,* Deputy State's Attorneys, Bennington, for Plaintiff-Appellee.

*Stephen L. Saltonstall* of *Witten, Saltonstall, Woolmington, Bongartz & Campbell, P.C.,* Bennington, for Defendant-Appellant.

*Robert Appel,* Defender General, and *Anna Saxman,* Appellate Defender, Montpelier, for Amicus Curiae Office of Defender General.

**Gibson, J.** Defendant was convicted in Bennington District Court of violating the "abusive language" provision of Vermont's disorderly conduct statute, 13 V.S.A. § 1026(3). He now challenges the constitutionality of that provision under the United States and Vermont constitutions. We affirm.

On May 20, 1993, at approximately 2:00 a.m., Trooper Michael Roj of the Vermont State Police responded to a single-car accident on Route 100 in Whitingham. Trooper Roj found defendant, whom the trooper knew, at the scene. Defendant told the trooper, "Mike, I fucked up." The trooper took no offense at defendant's language, but considered the comment to be "street language." The trooper detected the odor of alcohol on defendant's breath, and defendant stated that he had consumed a beer after the accident. The trooper, observing that defendant had suffered multiple facial lacerations, persuaded defendant to seek treatment for his injuries, and summoned an ambulance, which transported defendant to the emergency room of the Southwestern Vermont Medical Center.

At approximately 3:00 a.m., Trooper Roj arrived at the medical center to continue his accident investigation. He entered the hospital through the emergency entrance and observed an ambulance crew, a nurse, a physician, and another person, either a patient or a visitor, in the emergency admissions area. He also observed defendant in the same area, talking on a public telephone and then entering an examining room just off the emergency admissions area. After speaking with the nurse, Trooper Roj followed defendant into the examining room.

The trooper asked defendant several questions about the accident; defendant responded in a cooperative manner. Trooper Roj then told defendant that, because he believed defendant had been driving under the influence of intoxicating beverages, he would be processing defendant for DUI. He immediately observed that defendant went "from being very cooperative and very personable to being very uncooperative, very aggressive, very argumentative, very insulting, very profane, and display[ing] a number of very aggressive mannerisms." Specifically, defendant shouted: "You're a fucking piece of shit. . . . You're a fucking asshole. . . . I want you to get out of my face. You're dead." Defendant's tone of voice was very loud, and Trooper Roj observed that defendant's arms were flexed and rigid, his fists were clenched, his teeth were grinding, and his facial expression was rigidly set in what the trooper called "the thousand-mile stare."

Trooper Roj attempted to calm defendant down, and advised him that there were a number of other people in the emergency room who should not be subjected to defendant's tone of voice or language. The trooper also told defendant that he could face criminal charges for his behavior. Defendant became even angrier, and shouted: "Go ahead, you fucking pig. You're a stupid fucking pig. You're not even here, you pig." Trooper Roj felt "a sense of great anger built up within me based upon not only the words that were used, but the voice, the aggressive voice in which they were used," and felt "afraid of the possibilities of an imminent attack by Mr. Read upon me," particularly after defendant told the trooper, "You're dead."[1] During defendant's tirade, the door of the examining room was open. When Trooper Roj left the room, he observed a physician seated in an adjacent room with its

---

[1] Contrary to the assertion of the dissent, Trooper Roj contrasted his strong reaction to defendant's statements in the examining room with his impassive response to defendant's earlier "street language."

door open, and a nurse seated forty-five feet from the examining room.

Trooper Roj acknowledged that he had had both training and experience in dealing in a nonviolent manner with abusive persons, including intoxicated persons, and that he would be subject to disciplinary action if he struck a person merely for being verbally abusive.

Defendant was charged with disorderly conduct, in violation of 13 V.S.A. § 1026(3), which provides, in pertinent part: "A person who, *with intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof* . . . [i]n a public place *uses abusive . . . language* . . . shall be imprisoned for not more than 60 days or fined not more than $500.00 or both." 13 V.S.A. § 1026(3) (emphasis added). Defendant moved for dismissal on the grounds that the statute is facially vague and overbroad in that it impermissibly infringes free speech, as guaranteed under the United States and Vermont constitutions. The trial court denied defendant's motion, holding that the "abusive language" provision of § 1026(3) applies only to "fighting words," as that term was used by the United States Supreme Court in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). Defendant was convicted following a bench trial.

Defendant renews his federal and state constitutional challenges on appeal. Because the Vermont Constitution may not derogate any rights guaranteed under the United States Constitution, *Benning v. State*, 161 Vt. 472, 475 n.2, 641 A.2d 757, 758 n.2 (1994), we begin with defendant's federal constitutional claims.

## I.

Defendant contends that the "abusive language" provision is unconstitutionally vague and overbroad, in violation of the First and Fourteenth Amendments to the United States Constitution.[2] Identical claims were raised by an earlier case, *State v. Elwell*, 131 Vt. 245, 303 A.2d 134 (1973), but we were not called upon to resolve those claims, because we determined that the interlocutory appeal had been improvidently granted by the trial court. *Id.* at 248, 303 A.2d at 136. We acknowledged in *dictum*, however, that "the statute in question

---

[2]The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The "due process" clause of the Fourteenth Amendment makes the protections of the First Amendment applicable to the states. U.S. Const. amend. XIV, § 1; *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

might be found to have a constitutional infirmity under one set of circumstances, [but] possibly a different answer might be given under another." *Id.* at 248, 303 A.2d at 135. We have previously rejected overbreadth and vagueness challenges to other provisions of the disorderly conduct statute that proscribe conduct rather than speech. See, e.g., *State v. Begins*, 147 Vt. 45, 48, 509 A.2d 1007, 1009 (1986) (rejecting vagueness challenge to "violent, tumultuous or threatening behavior" provision of 13 V.S.A. § 1026(1)); *State v. Arbeitman*, 131 Vt. 596, 601, 313 A.2d 17, 20 (1973) (rejecting vagueness and over-breadth challenges to "[o]bstructs . . . pedestrian traffic" provision of 13 V.S.A. § 1026(5)). On its face, however, the "abusive language" provision of 13 V.S.A. § 1026(3) proscribes speech, rather than conduct.

Although vagueness and overbreadth challenges are doctrinally distinct, see generally L. Tribe, American Constitutional Law § 12.11, at 860-61 (2d ed. 1988), nevertheless, when they arise in a First Amendment context, we "'vie[w] vagueness and overbreadth as logically related and similar doctrines.'" *State v. Cantrell*, 151 Vt. 130, 134, 558 A.2d 639, 642 (1989) (quoting *Kolender v. Lawson*, 461 U.S. 352, 359 n.8 (1983)).

█    When a statute punishes only spoken words, it can withstand an attack upon its facial constitutionality only if "it is not susceptible of application to speech, although vulgar or offensive, that is protected by the First and Fourteenth Amendments." *Gooding v. Wilson*, 405 U.S. 518, 520 (1972). Thus, we will not reach challenges based on facial unconstitutionality if there is a "'readily apparent construction [that] suggests itself as a vehicle for rehabilitating the statut[e].'" *Id.* at 521 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 491 (1965)); accord *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988) ("It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld.") (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975)). Indeed, this Court is obligated to narrow and limit the statute in light of the protections guaranteed by the United States and Vermont constitutions. See *Commonwealth v. Mastrangelo*, 414 A.2d 54, 57 (Pa. 1980) (construing analogous statute); *Cantrell*, 151 Vt. at 134, 558 A.2d at 642 ("Where possible, a statute must be construed to avoid constitutional infirmities.").

In *Chaplinsky*, the United States Supreme Court declared:

[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or *"fighting" words* — *those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . .*

315 U.S. at 571-72 (footnotes omitted) (emphasis added). The Court has recently acknowledged the continued vigor of the "fighting words" doctrine. See *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992) ("'fighting words' . . . constitute 'no *essential* part of any exposition of ideas'") (quoting *Chaplinsky*, 315 U.S. at 572).

Defendant contends that the trial court erred in construing the "abusive language" provision of 13 V.S.A. § 1026(3) to apply only to "fighting words." The history of the statutory provision, however, supports the trial court's construction. In 1972, the Legislature amended Vermont's "breach of the peace" statute[3] to follow the "disorderly conduct" language of Model Penal Code § 250.2(1). *State v. Cole*, 150 Vt. 453, 455, 554 A.2d 253, 255 (1988); *State v. D'Amico*, 136 Vt. 153, 155, 385 A.2d 1082, 1084 (1978). The major statutory change was the added requirement that the State prove, as an essential element of the offense, that a defendant acted with the intent to cause public inconvenience or annoyance, or with such recklessness as to create a risk of public inconvenience or annoyance. *D'Amico*, 136 Vt. at 155, 385 A.2d at 1084.

In construing statutes, our overriding objective must be to effectuate the intent of the Legislature. *State v. Forcier*, 162 Vt. 71, 74, 643 A.2d 1200, 1202 (1994). We accord statutes a presumption of constitutionality. *Benning*, 161 Vt. at 481, 641 A.2d at 762. We also presume that the Legislature makes changes in the law in light of relevant judicial precedents and with knowledge of prior legislation on the same subject. *Thayer v. Herdt*, 155 Vt. 448, 453, 586 A.2d 1122, 1125 (1990). When a statute is taken from a model act, it is often helpful to examine the intent behind the model act. *State v. Papazoni*,

---

[3] Prior to the amendment, the statute provided: "A person who disturbs or breaks the public peace . . . [b]y any disorderly act or language, which does not amount to assault or battery, or destruction of property, shall be imprisoned not more than thirty days or fined not more than $25.00 or both." 13 V.S.A. § 1021(2) (1958) (repealed 1972).

159 Vt. 578, 581, 622 A.2d 501, 503 (1993); see *D'Amico*, 136 Vt. at 156, 385 A.2d at 1084 ("Although the rationale of the Model Penal Code is not binding on this Court, it is indicative of what the General Assembly intended in adopting legislation modeled on the Code.").

According to the Comments to the Model Penal Code, *Chaplinsky* was one of

> the chief available precedents when the Model Code was drafted. *Chaplinsky* had made clear, at least, that an appropriate statute constitutionally could prohibit fighting words. This is the import of the Subsection (1)(b) coverage of one who, with purpose to cause public inconvenience or in reckless disregard of the risk thereof, "addresses abusive language to any person present." *The limitation to abusive language specifically addressed to a person present is an important factor in confining this version of the offense to the "fighting words" context.*

Model Penal Code § 250.2 cmt. 4 (emphasis added).

■ In light of the action of the Legislature in amending our statute to conform to the language of the Model Penal Code, and the intent of the Model Code drafters to limit the reach of the provision to "fighting words," we hold that the "abusive language" provision of § 1026(3) is properly construed as proscribing only "fighting words." Prosecution under that provision is appropriate only when a defendant's spoken words, when directed to another person in a public place, "tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572.

Nonetheless, in *Gooding v. Wilson*, the Court struck down, on both overbreadth and vagueness grounds, a Georgia statute that made it a crime for "[a]ny person . . ., without provocation, [to] use to or of another, and in his presence . . . abusive language, tending to cause a breach of the peace . . . ." 405 U.S. at 519-20. The Court held that the word "abusive" has "greater reach than 'fighting' words," *id.* at 525, and thus the Georgia statute "sweeps too broadly" by making it a crime "merely to speak words offensive to some who hear them." *Id.* at 527. Although 13 V.S.A. § 1026(3) also punishes "abusive language," the Vermont statute is distinct from the Georgia statute at issue in *Gooding*, because the Vermont statute requires an explicit intent element. Cf. Ga. Code § 26-6303 (1933), quoted in *Wilson v. Gooding*, 431 F.2d 855, 856 n.2 (5th Cir. 1970), *aff'd*, 405 U.S. at 520.

Limiting punishment to those who use abusive language with the requisite mental state is sufficient to save the statute from a vagueness or overbreadth challenge. See *Colten v. Kentucky*, 407 U.S. 104, 110 (1972) (rejecting vagueness and overbreadth challenges to disorderly conduct statute containing intent element nearly identical to 13 V.S.A. § 1026(3)); *Mastrangelo*, 414 A.2d at 57-58 (upholding analogous statute because of specific-intent requirement); *State v. Weber*, 505 A.2d 1266, 1271 (Conn. App. Ct. 1986) (same); see also *State v. Wilcox*, 160 Vt. 271, 273-74, 628 A.2d 924, 925-26 (1993) (upholding telephone harassment statute in part because of specific-intent requirement); cf. *City of Houston v. Hill*, 482 U.S. 451, 473-74 (1987) (Powell, J., concurring) (if statute, which Court struck down as vague and overbroad, had had explicit intent requirement, "it would narrow substantially the scope of the ordinance, and possibly resolve the overbreadth question; it would also make the language of the ordinance more precise, and possibly satisfy the concern as to vagueness").

Defendant contends, however, that the "fighting words" doctrine has less force when the person to whom the words are addressed is a peace officer engaged in official duties. Because police officers are trained to remain calm when confronted with hostile persons, and because police officers face disciplinary action if they react violently to the use of abusive language alone, then, in defendant's view, defendant's words could not "by their very utterance inflict injury or tend to incite an immediate breach of the peace," as required by *Chaplinsky*, 315 U.S. at 572. Defendant finds support for his position in the concurring opinion of Justice Powell in *Lewis v. City of New Orleans*, 415 U.S. 130 (1974).

In *Lewis*, the Court struck down as unconstitutionally overbroad a municipal ordinance that made it a crime for " 'any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty.' " *Id.* at 132 (quoting New Orleans Ordinance 828 M.C.S. § 49-7 (1972)). Although the Louisiana Supreme Court declared that the ordinance was limited only to "fighting words," the United States Supreme Court found that the state high court "contemplated a broader reach of the ordinance," and that the ordinance "plainly has a broader sweep than the constitutional definition of 'fighting words' announced in *Chaplinsky*." *Id.* at 132. Justice Powell, concurring in the judgment, reasoned that "a properly trained officer may reasonably be expected to 'exercise a higher

degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" *Id.* at 135 (Powell, J., concurring) (quoting *Lewis v. City of New Orleans*, 408 U.S. 913, 913 (1972) (Powell, J., concurring)).

We acknowledge that courts must take cognizance of the special circumstances involved in prosecutions for verbal abuse of police officers. See generally Model Penal Code § 250.2 cmt. 7. But unlike the ordinance at issue in *Lewis*, Vermont's disorderly conduct statute is not confined to verbal abuse of police officers. Rather, § 1026(3) makes no distinction among the victims it seeks to protect. Defendant thus invites us to create a statutory exception whereby persons who use abusive language in public enjoy greater protections when their intended victims are police officers. The states are divided on the application of such an exception. Compare *City of Bismarck v. Schoppert*, 469 N.W.2d 808, 813 (N.D. 1991) (evidence insufficient to support disorderly conduct conviction where police officers' "testimony confirmed the notion . . . that those well-trained and experienced police officers were able to hear Schoppert's vulgar and abusive speech as part of their duties") and *State v. John W.*, 418 A.2d 1097, 1106 (Me. 1980) ("We presume that a police officer would not so readily respond violently to conduct of the sort engaged in by John W.") with *State v. Wolff*, 657 A.2d 650, 654 (Conn. App. Ct. 1995) (upholding conviction under "abusive language" provision where defendant "confronted the officers in a public place," "conducted an unprovoked verbal attack on the officers using vile language," and "his language and actions annoyed and alarmed people in the vicinity") and *Person v. State*, 425 S.E.2d 371, 373 (Ga. Ct. App. 1992) (evidence sufficient to support finding that defendant used "fighting words" to arresting officer).

We do not believe that Vermont's statutory provision warrants excepting from its reach those incidents in which the victims are police officers. Indeed, we have previously affirmed convictions where defendants used "fighting words" to hinder law enforcement officers in the execution of their official duties. *State v. Dion*, 154 Vt. 420, 426, 578 A.2d 101, 104 (1990); accord *State v. Oren*, 162 Vt. 331, 335, 647 A.2d 1009, 1012 (1994).[4] The fact that police officers such as Trooper

---

[4] The dissent characterizes the "fighting words" doctrine as an "archaic relic" that hearkens back to "more chauvinistic times." 165 Vt. at 156, 680 A.2d at 953. In *Oren*, however, we affirmed a conviction for hindering a law enforcement officer under the "fighting words" doctrine, without regard to the fact that both the defendant and the

Roj are trained to deal calmly and authoritatively with disorderly persons does not guarantee that police officers are immune from reacting instinctively in the face of an abusive tirade. As one state supreme court justice has observed, "Because of the authority we vest in police officers we may have the right to expect them to exercise restraint. But we do not pay them enough to expect they will quash, if they could, all the same human reactions that other people have." *Schoppert*, 469 N.W.2d at 814 (VandeWalle, J., concurring). While police officers are experienced at handling unruly persons, the corollary is that police officers are obligated to confront such persons frequently. We may rightly expect that a police officer will act in accordance with his or her training or disciplinary rules. But to fashion from this expectation a judicial rule that relieves a person from the reach of a criminal statute solely because the victim is a police officer is to invite the use of abusive language toward police officers. We do not believe that such a rule is sound in practice or in principle.

Defendant further contends that "criticism" of police officers is a form of political speech to which the "fighting words" doctrine cannot constitutionally extend.[5] See *City of Houston*, 482 U.S. at 462-63 ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). Our practice, however, is that we will rule on the constitutionality of a statute only in the context of the factual situation of the case out of which it arises. *Begins*, 147 Vt. at 48, 509 A.2d at 1009. On the facts presented, we do not agree that defendant's statements to Trooper Roj constituted political speech. Whatever grievance defend-

---

officer were women. *State v. Oren*, 162 Vt. 331, 335, 647 A.2d 1009, 1012 (1994). We continue to view application of the doctrine as bearing no relation to the sex of the speaker or hearer.

[5] The Defender General, as amicus curiae, contends that, under 13 V.S.A. § 1026(3), "[o]nly those abusive words directed to a police officer in a public forum are actually punished in Vermont." Thus, according to amicus, even if we construe the statute to reach only "fighting words," the selective enforcement of the statute in practice has resulted in "content-based regulation of speech," which the United States Supreme Court held unconstitutional in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384-85 (1992). The statute is, however, content-neutral on its face. Amicus provides no facts, law or analysis to support its assertion that the statute in its application is a content-based regulation. Amicus thus invites us to strike down the statute based only on speculation; we decline to do so. See *KPC Corp. v. Book Press, Inc.*, 161 Vt. 145, 152, 636 A.2d 325, 329 (1993) (assertions in brief unaccompanied by facts, law or reasoning need not detain us).

ant may have been attempting to articulate with respect to the policy of DUI processing, or to Trooper Roj's implementation of such a policy, was substantially outweighed, if not negated, by the personal invective defendant heaped upon Trooper Roj, who was an acquaintance of defendant's.

We conclude, therefore, that the statute was properly applied to defendant's statements in this case. Defendant, while awaiting medical treatment in a hospital emergency room, with a number of other persons nearby, pointedly directed a tirade of invective at Trooper Roj and did so while flexing his arms, clenching his fists, and grinding his teeth. As the Connecticut appeals court said in similar circumstances:

> The use of invectives in the nature of those utilized by the defendant do not automatically come under the shield of the federal or state constitutions as protected speech, but can only be classified in juxtaposition with the other factors present when the words were expressed. The words, standing alone, are, except for their lexicographical definition, without consequence. When, however, as in this case, they are shouted by an obviously intoxicated person in a hostile and challenging confrontation and in front of a crowd of people . . ., they may constitute the abusive language and breach of the peace proscribed by the statute.

*Weber*, 505 A.2d at 1270; see also *Commonwealth v. Pringle*, 450 A.2d 103, 104, 107 (Pa. Super. Ct. 1982) (defendant who "looked directly at" arresting officer and "repeatedly shouted 'goddamn fucking pigs'" engaged in "fighting words" and "created a risk of public inconvenience, annoyance [and] alarm" in violation of disorderly conduct statute).

## II.

Defendant also challenges the validity of the "abusive language" provision of 13 V.S.A. § 1026(3) under Chapter I, Articles 13 and 20 of the Vermont Constitution.[6] Defendant argues that the constitu-

---

[6]The Vermont Constitution provides: "That the people have a right to freedom of speech," Vt. Const. ch. I, art. 13, and, "That the people have a right to assemble together to consult for their common good — to instruct their Representatives — and to apply to the Legislature for redress of grievances, by address, petition or remonstrance." *Id.* ch. I, art. 20.

tional language and history demonstrate that the Vermont Constitution accords greater protections to free speech than does the United States Constitution.

We have recognized that "[t]he Vermont Constitution may afford greater protection to individual rights than do the provisions of the federal charter." *State v. Kirchoff*, 156 Vt. 1, 4, 587 A.2d 988, 991 (1991). We have suggested that the right of free speech guaranteed under Chapter I, Article 13 is coextensive with the First Amendment, *Shields v. Gerhart*, 163 Vt. 219, 226-27, 658 A.2d 924, 929 (1995), but we have expressly reserved a final determination of the congruence of the state and federal rights. *In re Morrissey*, 149 Vt. 1, 18, 538 A.2d 678, 689 (1987).

■ As final interpreter of the Vermont Constitution, this Court has final say on what process is due in any given situation. *State v. Porter*, 164 Vt. 515, 518, 671 A.2d 1280, 1282 (1996). Defendant, however, bears the burden of explaining how or why the Vermont Constitution provides greater protection than the federal constitution. *Id.* The late Justice Thomas Hayes, writing for this Court in *State v. Jewett*, 146 Vt. 221, 500 A.2d 233 (1985), suggested several arguments that a defendant might use to meet his burden. *Id.* at 226-27, 500 A.2d at 236-37. Defendant in the instant matter raises textual, comparative, and historical arguments to support an expansive protection of free speech under the Vermont Constitution.[7] We find none of these arguments persuasive.

■ Defendant first observes that the Vermont Constitution contains no fewer than four separate provisions expressly guaranteeing

---

[7]Defendant has not raised empirical, doctrinal, prudential, structural or ethical arguments, all of which were suggested by Justice Hayes in *State v. Jewett*, 146 Vt. 221, 227, 500 A.2d 233, 237 (1985). Nor has defendant framed his argument in terms of "core values," a principle that has at times guided our analysis of distinctions between state and federal constitutional rights. See, e.g., *State v. Rogers*, 161 Vt. 236, 246, 638 A.2d 569, 575 (1993) (because paramount concern in search and seizure cases is to give effect to core values of privacy underlying Vt. Const. ch. I, art. 11, Court has not hesitated to depart from parallel federal law when necessary to achieve this goal). But cf. *State v. Welch*, 160 Vt. 70, 76, 624 A.2d 1105, 1108 (1992) (Court's Article 11 jurisprudence has diverged from Fourth Amendment analysis even though core value of privacy is identical under federal and state constitutions); see also *Bennett v. Thomson*, 363 A.2d 187, 195 (N.H. 1976) (Grimes, J., dissenting) ("[T]he free and unhindered debate on matters of public importance . . . is the core value of the free speech clause of the first amendment and part I, article 22 of the New Hampshire constitution and lies at the very foundation of our free society."). Consequently, our decision today does not address the distinctions, if any, between the state and federal constitutional protections that might be shown to exist upon consideration of those principles.

the right of free speech. See Vt. Const. ch. I, art. 13 (freedom of speech); *id.*, art. 14 ("freedom of deliberation, speech, and debate, in the Legislature"); and *id.*, art. 20 (rights to assemble and to petition Legislature for redress of grievances). The state provisions, however, mirror four clauses of the United States Constitution. See U.S. Const. art. I, § 6 (immunity for legislative "Speech or Debate"); *id.*, amend. I (freedom of speech and rights to assemble and petition for redress). An argument grounded solely upon numerical prevalence is therefore unavailing.

Defendant next offers a comparison between the Vermont Constitution and several other state constitutional schemes as support for an expansive free-speech right. Specifically, defendant observes that, in contrast to the right recognized in the Vermont Constitution, the majority of state constitutions, including the Pennsylvania Constitution, qualify the speaker's liberty of speech with the "responsib[ility] for the abuse of that liberty." Pa. Const. art. 1, § 7; see also *Developments in the Law — The Interpretation of State Constitutional Rights*, 95 Harv. L. Rev. 1324, 1399 n.3 (1982) (listing state constitutional provisions). Because the Vermont Constitution does not qualify its free-speech right with a speaker's affirmative responsibility, then, according to defendant, our state charter must be interpreted to afford Vermont speech the highest degree of protection. By comparing state constitutions that *differ* from the Vermont charter, however, · defendant overlooks the premise of the "sibling state approach" to state constitutional analysis, which "involves seeing what other states with *identical or similar* constitutional clauses have done." *Jewett*, 146 Vt. at 227, 500 A.2d at 237 (emphasis added). Defendant provides no comparison to similar state constitutions, and thus invites us to resolve his constitutional claim based only upon an inference drawn from dissimilar state constitutions. We decline defendant's invitation.

Finally, defendant argues that the history of Vermont manifests a greater tolerance for the individual costs engendered by abusive language when weighed against the common benefits in protecting liberty. Indeed, historians have long observed that, in early Vermont, "'the language of profanity was the common dialect.'" D. Ludlum, *Social Ferment in Vermont, 1791-1850* 21 (1939) (quoting C. Wright, *The Advisor* (1811)). Defendant points out that, in 1798, Vermont voters reelected Congressman Matthew Lyon while he sat in jail, convicted of using abusive language under the Sedition Act of 1798. A. Austin, *Matthew Lyon: "New Man" of the Democratic Revolution,*

*1749-1822* 124 (1981). Yet, in 1799, the Governor and Council of Vermont, responding to resolutions by Kentucky and Virginia opposing the Sedition Act and espousing the doctrine of nullification as a limitation on the authority of the national government, stated:

> In your . . . resolution you . . . severely reprehend the act of Congress commonly called "the Sedition bill." If we possessed the power you assumed, to censure the acts of the General Government, we could not consistently construe the Sedition bill unconstitutional; because *our own constitution guards the freedom of speech and the press in terms as explicit as that of the United States,* yet long before the existence of the Federal Constitution, we enacted laws which are still in force against sedition, *inflicting severer penalties than this act of Congress.*
>
> And although the freedom of speech and of the press are declared unalienable in our bill of rights, yet the railer against the civil magistrate, and the blasphemer of his Maker, are exposed to grievous punishment. And no one has been heard to complain that these laws infringe our state Constitution.

Appendix K: Replies of Vermont to the Kentucky and Virginia Resolutions of 1798, in *IV Records of the Governor and Council of Vermont* 525, 527 (E. P. Walton ed. 1876) (emphasis added). The historical record is thus inconclusive on the question of whether the Vermont Constitution provides a broader protection for free speech.

█ Defendant points to our decision in *Harris v. Huntington,* 2 Tyl. 129 (1802), in which we held that the "redress of grievances" provision of Chapter I, Article 20 of the Vermont Constitution creates an absolute privilege for libelous statements addressed to the Legislature. *Id.* at 146; accord *In re Davenport,* 129 Vt. 546, 559, 283 A.2d 452, 458-59 (1971) ("[A]lthough the subject of a petition may deviate from the views of others or may engender controversy, we must bear that risk."). As defendant correctly observes, our reasoning in *Harris* was expressly rejected by the United States Supreme Court, which refused to fashion a similar rule under the Petition Clause of the First Amendment. *White v. Nicholls,* 3 How. 266, 282 (citing *Harris*), 291 (1845); accord *McDonald v. Smith,* 472 U.S. 479, 483 (1985) (distinguishing the "absolute position of the Vermont court" in *Harris*). Immunity under the petition clause, however, protects only statements addressed directly to the Legislature. *Harris,* 2 Tyl. at 146. We

observed in *Harris* that such immunity "is indispensable[] from the right of petitioning the supreme power for the redress of grievances; for it would be an absurd mockery in a government to hold out this privilege to its subjects, and then punish them for the use of it." *Id.* at 139-40. Consequently, we held that "the abuse of the right must be submitted to in common with other evils in government, as subservient to the public welfare." *Id.* at 146. Such concerns do not underlie the right of free speech generally, and defendant's reliance on the petition clause is inapposite.

Defendant having failed to demonstrate that the Vermont Constitution affords a more expansive free-speech right than is found under the federal charter, we conclude that the statements that formed the basis for his disorderly conduct conviction find no constitutional protection.

*Affirmed.*

**Morse, J.,** dissenting. I respectfully dissent. In my view, the "fighting words" doctrine has become an archaic relic, which found its genesis in more chauvinistic times when it was considered bad form for a man to back down from a fight. Even the United States Supreme Court, which created it in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572 (1942), has never since used the "fighting words" doctrine to *uphold* a conviction. Note, *The Demise of the Chaplinsky Fighting Words Doctrine: An Argument for its Interment,* 106 Harv. L. Rev. 1129, 1129 (1993). Recognition in legal analysis that it is "reasonable" to expect a person to retaliate with his fists when provoked by speech, it seems to me, runs counter to what the law should endorse. And, even if the doctrine has any vitality left to it, it is not available to save the conviction in this case.

To begin with, the statute under consideration does not limit itself to "fighting words," and it is not our proper function to rewrite it. The statute reads:

§ 1026 Disorderly conduct

*A person who, with intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof:*
(1) Engages in fighting or in violent, tumultuous or threatening behavior; or
(2) Makes unreasonable noise; or
(3) *In a public place uses abusive* or obscene *language;* or

(4) Without lawful authority, disturbs any lawful assembly or meeting of persons; or

(5) Obstructs vehicular or pedestrian traffic, shall be imprisoned for not more than 60 days or fined not more than $500.00 or both.

13 V.S.A. § 1026 (emphasis added). Defendant was charged with violating the emphasized provision of § 1026. As can be readily determined, "fighting" under § 1026(1) is limited to the physical, not the verbal.

The victim of the offense was a police officer. The so-called "fighting words" "specifically addressed" to him were:

You're a fucking piece of shit.
You're a fucking asshole.
I want you to get out of my face.
You're dead.
Go ahead, you fucking pig.
You're a stupid fucking pig.
You're not even here, you pig.

These words — parroting familiar dialogue of screenwriters — are as devoid of fighting content as they are lacking in imagination. The trooper simply attributed the choice of words to "street language," spoken by a man whom he knew ("Mike, I fucked up"). The "fighting" content of the tirade can only be attributed to defendant's ascension emotionally from calm and friendly to "very uncooperative, very aggressive, very argumentative, very insulting, very profane, and display[ing] a number of very aggressive mannerisms," such as arms flexed and rigid, fists clenched, teeth grinding, and facial expression rigidly set in the "thousand-mile stare." Indeed, the situation more approximates a violation of § 1026(1) ("[e]ngages in . . . threatening behavior") than a violation of § 1026(3) ("uses abusive . . . language").

The scene ironically suggests that had defendant not vented in his "very profane" way, he would have probably punched the trooper in the nose. The evidence does not suggest, on the other hand, that defendant was in any danger of assault from the trooper. The trooper inferred "an imminent attack" from defendant's language and demeanor, but had no intention to strike defendant. The trooper felt "a sense of great anger" build up and fear, but he assured the court that his training, experience, and knowledge of disciplinary rules prevented him from striking defendant. There is nothing in this record or

common sense to suggest that even an average person would have been so provoked by defendant's behavior that he would have physically attacked defendant. Defendant's words were certainly annoying, and, I suppose, someone — perhaps another intoxicated male — might reasonably have been expected to start a fight upon hearing them. But, a conviction cannot validly rest on that. The Court has misunderstood the "fighting words" doctrine.

The doctrine has undergone a rather ragged development since World War II when it was first announced. Today, it is largely discredited as "a hopeless anachronism that mimics the macho code of barroom brawls." K. Sullivan, *The First Amendment Wars*, New Republic, Sept. 28, 1992, at 35, 50. The doctrine is limited to words likely to immediately provoke the individual listener to whom they are directed to start a fight. An objective standard is required to determine that issue — that is, would a reasonable *police officer* be expected to use violence against the speaker given the circumstances and the characteristics of the speaker and officer? The test is not met just because somebody somewhere hearing "the words" might start a fight. See *Gooding v. Wilson*, 405 U.S. 518, 524 (1972) (words must have direct tendency to provoke violent acts "by the person to whom, individually, the remark is addressed").

In *Gooding*, the high court struck down a statute interpreted by Georgia exactly as this Court interprets the Vermont statute. Georgia applied the fighting words doctrine to prohibit "abusive language," which tends to cause a "breach of peace," directed at one "'who, on account of circumstances or by virtue of the obligations of office, can not actually then and there resent the same by a breach of the peace.'" *Id.* at 519, 526 (quoting *Elmore v. State*, 83 S.E. 799, 799-800 (Ga. Ct. App. 1914). Most evidently, the United States Supreme Court has included a "clear and present danger" component in the doctrine. *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (speech may be punished only if likely to produce "'a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest'") (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)). The words spoken must prompt the one addressed to respond with violence by attacking the speaker then and there. See L. Tribe, American Constitutional Law § 12-18, at 929 n.9 (2d ed. 1988).

Because this Court has acknowledged that under an objective test the police officer here was not likely to assault defendant due to what he said, that finding should be dispositive of this appeal. Instead, the Court overrides the federal law announced in *Gooding* by saying

merely that people should be discouraged from using vulgar language around police because "'we do not pay [police officers] enough'" to put up with it. 165 Vt. at 151, 680 A.2d at 950 (quoting *City of Bismarck v. Shoppert*, 469 N.W.2d 808, 814 (N.D. 1991) (VandeWalle, J., concurring). That, of course, begs the constitutional question.

I agree that abusive language is annoying and sometimes exceedingly painful to take. If, however, mere words that might hypothetically induce pugnacious persons to lash out may serve as a basis for punishing the speaker, no matter to whom spoken, two dangers are apparent: one, the law is driven by the lowest common denominator modeled after the stereotypical "male chauvinist," and, two, the very vagueness of the test will sweep up content-protected speech if spoken with sufficiently agitated body language.

The Court concludes that the statute is saved from a vagueness challenge because defendant must have had the specific intent as defined in the law. At the very least, then, the State must prove that by uttering the fighting words defendant was recklessly creating a risk of public inconvenience or annoyance. This mental element did not save the Louisiana breach of peace law in *Lewis v. City of New Orleans*, 415 U.S. 130, 132 (1974) (unlawful for person "wantonly . . . to use . . . opprobrious language toward" police officer). Indeed, this element would be present in every case where the other elements of the crime are proved. A person speaking abusively in public would naturally expect somebody to be annoyed. The Court, however, has not narrowed the definition of the mental element to an intent to provoke a fight. It seems to me that the fighting words doctrine, no matter how archaic that concept, demands no less. In short, the law's mental element, intent to annoy, is not a "large enough tail to wag this dog."

I would reverse. I am authorized to say that Justice Dooley joins this dissent.