## Jipac, N.V. v. Paul Silas, David Currier and Marcel Roberts

[800 A.2d 1092]

No. 00-424

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed May 31, 2002

58

*Matthew T. Daly* and *Susy Rachel DiCello* of *Doremus, Kantor & Daly*, Burlington, for Plaintiff-Appellant.

*Robert M. Fairbanks* of *Gaston, Durrance & Fairbanks*, Montpelier, for Defendant-Appellee Silas.

*Robert F. O'Neill* of *Gravel and Shea*, Burlington, for Defendants-Appellees Currier and Roberts.

**Dooley, J.** Plaintiff Jipac, N.V., which sued defendants Paul Silas, David Currier, and Marcel Roberts for default on a promissory note, appeals the superior court's decision to order rescission of the parties' contract for the purchase of land that plaintiff subdivided and sold to defendant Paul Silas without obtaining a required Act 250 permit. We conclude that the superior court acted within its discretion in ordering the remedy, and therefore affirm its judgment.

On June 25, 1989, Jipac conveyed eight individual lots by eight separate warranty deeds to Silas, who executed, in favor of Jipac, a $70,000 promissory note secured by a mortgage on the lots conveyed. The note was guaranteed by defendants Currier and Roberts. As part of the transaction, Jipac provided Silas with an Act 250 disclosure statement certifying facts indicating that the lots did not require an Act 250 permit. See 10 V.S.A. § 6007(a) (before subdividing land, seller shall prepare Act 250 disclosure statement that must be provided to buyer within ten days of entering into purchase and sales agreement).

Silas stopped making payments on the note in the summer of 1990. In February 1992, Silas informed Jipac that he was entitled to rescind the transaction because the State of Vermont had taken the position that the conveyance violated Act 250. In response, Jipac sued defendants on the note. Defendants sought rescission of the transaction in a counterclaim based on the absence of an Act 250 permit. After Jipac's motion for judgment on the pleadings was denied, the superior court action was stayed pending resolution of Jipac's appeal to the environmental board of the district coordinator's 1994 advisory opinion that an Act 250 permit was required for conveyance of the lots. In December 1997, the board upheld the district coordinator's ruling that an Act 250 permit was required.

The board rejected Jipac's position that it was exempt from Act 250 regulation because it had subdivided only nine lots. Jipac now acknowledges that the sale of the subdivided lots was unlawful. See 10 V.S.A. § 6081(a). Act 250 does not specify what private remedy applies to an unlawful subdivision. It does provide that a violation of the Act "is punishable by a fine of not more than $500.00 for each day of the violation or imprisonment for not more than two years, or both." *Id.* § 6003.

On August 29, 2000, following a November 1999 hearing on the parties' opposing motions for summary judgment, the superior court ordered rescission of the transaction. The court canceled the promissory note, voided the warranty deeds, and vested title to the property back to Jipac. Defendants were awarded a judgment for sums paid on the note. The total judgments for defendants were just over $80,000.[1] The court stated that rescission was the appropriate remedy because the lots were not transferable as sold, and there is a presumption that a buyer intends to purchase land that can be resold. In the court's view, because nothing could be done with the lots absent

---

[1] Paul Silas obtained a judgment for $58,631. David Currier and Marcel Roberts received judgments for $21,628.

an Act 250 permit, damages would not provide defendants with the benefit for which they bargained.

On appeal, Jipac argues that defendants were not entitled to rescission because they failed to mitigate their damages by seeking to obtain an Act 250 permit under an environmental board rule providing an abbreviated process for innocent purchasers of land lacking a required permit. See 10 V.S.A. § 6025(c) (requiring innocent purchaser rule). According to Jipac, because defendants failed to avail themselves of the so-called "innocent purchaser" rule, they are foreclosed from obtaining rescission as a remedy. Jipac contends that the trial court could have awarded defendants damages for expenses involved in obtaining an Act 250 permit, and thus rescission is not warranted.

To support its arguments, Jipac relies primarily on *Robitaille v. Rubin*, 159 Vt. 152, 615 A.2d 1025 (1992), and *Paradise Restaurant, Inc. v. Somerset Enterprises, Inc.*, 164 Vt. 405, 671 A.2d 1258 (1995). We conclude that *Robitaille* and *MacDonald v. Roderick*, 158 Vt. 1, 603 A.2d 369 (1992), are the critical precedents, but that the part of the analysis in *Robitaille* relied upon by Jipac must be overruled. We further conclude that, weighing the pertinent criteria, a private remedy is warranted for Jipac's Act 250 violation, and that the superior court acted within its discretion in ordering rescission.

In *Robitaille*, the plaintiffs sold a house to the defendants, but failed to comply with a provision of the applicable Act 250 permit requiring the sellers to show the permit, the approved plot plan, and the certification of compliance to the buyers. When the defendants refused to close the sale, the plaintiffs sued on the purchase and sales contract. The superior court awarded judgment for the defendants, ruling that the failure to comply with the permit condition gave the defendants the right to rescind the contract. In reversing the judgment, we noted that the Legislature had not created a rescission remedy for failure to comply with a permit condition, although it had created a rescission remedy for certain other violations of Act 250, and held that we would not adjudicate a remedy into existence where the Legislature had not created one. *Robitaille*, 159 Vt. at 154, 615 A.2d at 1025-26.

We went on, however, to discuss an alternative theory on which defendants might prevail — illegal contract. *Id.* Relying upon *MacDonald v. Roderick*, 158 Vt. 1, 603 A.2d 369, we held that the court could refuse to enforce the contract if the violation of the permit condition tainted the agreement or made its enforcement unfair. *Robitaille*, 159 Vt. at 154, 615 A.2d at 1026. Because there was no evidence on whether the sellers' failure to make the required

disclosures made the enforcement of the contract unfair, we remanded for further proceedings. *Id.*

In *MacDonald*, we reasoned that regulatory requirements represent "a public policy that may be used as a defense" in an appropriate case. 158 Vt. at 7, 603 A.2d at 372. In determining what is an appropriate case, we adopted the Restatement approach, *id.*, which requires weighing the public policy against enforcement — the strength of the policy, the likelihood that a refusal to enforce will further that policy, the seriousness of any misconduct involved, and the directness of the connection between that misconduct and the term of the contract to be enforced — against the interests in favor of enforcement of the promise — the parties' justified expectations, any forfeiture that would result, and any public interest in enforcement. See Restatement (Second) of Contracts § 178 (1981).

*MacDonald* involved a suit for a real estate sales commission in which the defendant alleged that the listing agreement used by the broker violated certain rules of the Vermont Real Estate Commission. We held that the violation of a rule requiring a written listing agreement would always create a defense under the standards set forth above, but that the violation of a requirement to use specific language or to include a specific term will not provide a defense unless there is a nexus between the violation and the dispute between the parties such that "the violation makes recovery unfair in the particular case before the court." *MacDonald*, 158 Vt. at 7, 603 A.2d at 373.

According to Jipac, rescission is unavailable in this case because *Robitaille* stands for the proposition that rescission is never a proper remedy for a violation of Act 250 without specific statutory authorization. Because *Robitaille* can be read as broadly as Jipac suggests, we have reconsidered its rationale. On reflection, we conclude that the part of the *Robitaille* opinion discussing rescission was in error.

The statutory language on which we relied in *Robitaille* makes the purchase and sale of land "unenforceable" because of a violation of Act 250 in certain circumstances. 10 V.S.A. § 6007(a). As many of our cases make clear, the term "unenforceable" is a description of the remedy for an illegal contract and is normally synonymous with "void." See *My Sister's Place v. City of Burlington*, 139 Vt. 602, 613, 433 A.2d 275, 282 (1981) (an illegal contract "may be held void and unenforceable"). Typically, statutes use the terms "unenforceable" and "void" together. See, e.g., 3 V.S.A. § 964; 10 V.S.A. § 6262(c). As more fully discussed below, the usual remedy for an illegal or unenforceable contract is to

leave the parties as the court finds them at the time the illegality is discovered, not to restore them to the same position they would have been had the contract never existed. See *Pierce v. Kibbee*, 51 Vt. 559, 561 (1879) (illegal contracts "are void, and courts will neither aid in enforcing them, nor in the recovery of money paid in the performance of them"). Rescission, on the other hand, is not ordinarily an available remedy in connection with an illegal contract. See *Licking County v. Maharg*, 575 N.E.2d 529, 531 (Ohio C.P. 1990). Thus, notwithstanding our suggestion to the contrary in *Robitaille*, § 6007(a) should not be construed as specifically authorizing the remedy of rescission.

The discussion of rescission was also unnecessary in *Robitaille*. The contract to sell the land was unexecuted. The plaintiffs were suing the defendants for damages for breach of the purchase and sale contract. To the extent the defendants could demonstrate the right to relief under the *MacDonald* factors, the plaintiffs' failure to comply with the permit conditions represented an affirmative defense to the plaintiffs' recovery. The defendants obtained no advantage by labeling the relief they wanted as "rescission."

Properly understood, the provisions of 10 V.S.A. § 6007(a) that make land sales contracts unenforceable in certain circumstances represent specific instances where the Legislature has done something akin to the balancing set forth in *MacDonald* and decided that the buyer should have a private remedy. We do not believe, however, that these provisions preclude the application of a private remedy in other instances of statutory violations where the *MacDonald* factors warrant it. Unlike the specific instances covered by the statute, however, we must decide on a case-by-case basis whether and, if so, what private remedy is available.

We conclude that a balance of the factors outlined in *MacDonald* supports the trial court's decision that there be a private remedy in this case. In the findings and declaration of intent accompanying Act 250, the Legislature expressed the underlying policy:

> [T]he legislature declares that in order to protect and conserve the lands and the environment of the state and to insure that these lands and environment are devoted to uses which are not detrimental to the public welfare and interests, the state shall, in the interest of the public health, safety and welfare, exercise its power by creating a state environmental board and district environmental commissions conferring upon them the power to regulate the use of lands . . . .

1969, No. 250 (Adj. Sess.), § 1; see *In re Pilgrim Partnership*, 153 Vt. 594, 596, 572 A.2d 909, 910 (1990) (one purpose of Act 250 is to insure that lands are devoted to uses which are not detrimental to public welfare and interests). The Act specifically imposes the responsibility for compliance with respect to subdivided land on the seller. See 10 V.S.A. § 6081(a).

We view the policy involved in this case as exceptionally strong and certainly not a "minor administrative regulation[] or local ordinance[] that may not be indicative of the general welfare." Restatement (Second) of Contracts § 178 cmt. c. That important policy is directly undermined when sellers are able to evade Act 250 review of lands intended to be covered by the statute. Refusing to allow sellers to benefit from the contract for the sale of land in such circumstances is a powerful incentive for them to comply with Act 250. Indeed, without some private remedy, a poorly capitalized corporation formed solely to hold land may have little incentive to seek an Act 250 permit.[2]

The Legislature was sufficiently concerned with the sale of subdivided land without an Act 250 permit that it required "the seller or other person dividing or partitioning the land" to prepare and give to the purchaser an Act 250 disclosure statement that includes information bearing on whether a permit is required. 10 V.S.A. § 6007(a). Clearly, the Legislature's intent was to prevent exactly the situation that occurred here — a sale of subdivided land without a required Act 250 permit.

Jipac argues, however, that the Legislature knows how to provide a remedy when it wants to and did so in § 6007(a) when specified circumstances arise, which do not include the circumstances present in this case. Thus, according to Jipac, no remedy is available. We recognize that the Legislature explicitly made purchase and sales agreements unenforceable in only two circumstances: (1) when the seller fails to provide the disclosure statement, and (2) when the seller provides the buyer with previously undisclosed information indicating that a transfer "is or may be subject to" Act 250. *Id.* We further acknowledge that these circumstances are similar to what occurred here, and yet the statute provides no explicit remedy for the instant situation.

---

[2] Although there is no evidence of deliberate misconduct in this case, Jipac did attempt to evade Act 250 by placing ownership of land in numerous separate, but affiliated, corporations and subdividing the land into nine lots, one short of the number that would have triggered Act 250 review.

On the other hand, Jipac's conduct in this case plainly falls within the area of the Legislature's policy concern, such that a holding that the buyer has no remedy would seriously undermine the intended policy. Act 250 required Jipac to disclose the names "of all individuals and entities affiliated with the seller ... for the purpose of deriving profit or consideration, or acquiring any other beneficial interest from the partition or division of the land, as that affiliation is conditioned and limited according to the definition of 'person' in section 6001(14) of this title." 10 V.S.A. § 6007(a)(2). In its decision holding that the instant transaction required an Act 250 permit, the environmental board concluded that such affiliated individuals existed, and that their actions created Act 250 jurisdiction over the subdivision. Disclosure of the individuals involved would have shown that the sale of the subdivision "may be subject to"Act 250, a specific ground for relief.

Ironically, Jipac would have us hold that a private remedy for an Act 250 violation is available if a seller fails to make a disclosure statement or the disclosure statement indicates that a permit is required, but that the buyer has no remedy if the disclosure statement fails to disclose facts that would show the need for an Act 250 permit. In effect, Jipac asks us to hold that its own violation of the statute deprives defendants of any private remedy. We decline to do so. Section 6007 does not explicitly provide a private remedy for violations such as the one that occurred here, but the Legislature clearly established in that provision a direct connection between the violation of Act 250 and the unenforceability of contracts requiring buyers to pay for land sold to them in violation of Act 250.

We recognize that the Restatement factors must be balanced against Jipac's "interest in the enforcement" of the note, Restatement (Second) of Contracts § 178(2), and that Jipac's justified expectation in being paid on the note is particularly strong in a case like this where the contract is executed and the buyers have legal title to the land. Nevertheless, we conclude that the public policy against enforcement in these circumstances clearly outweighs Jipac's interest in enforcement of the note. See *id.* § 178(1). Thus, defendants are entitled to a private remedy. The adverse effect on Jipac's interests can be mitigated through the remedy that is fashioned.

Before considering the nature of that remedy, we address Jipac's argument that defendants are not entitled to a private remedy because Silas could easily obtain the required permit under a special procedure for "innocent purchasers," and the Legislature intended they have only that remedy in these circumstances. In making this argument,

Jipac relies on 10 V.S.A. § 6025(c) and the environmental board's implementing rule, Rule 60. Jipac calls this a simplified process that would give defendants an Act 250 permit within a short period of time.

The special process on which Jipac relies was added by the Legislature in 1991 to deal with situations similar to those present here — an unsuspecting buyer purchased lots subdivided and sold without the necessary Act 250 permit. For pre-1991 sales to "innocent purchasers" as defined in the law,[3] the legislation required the environmental board to create a "modified process" so that the purchaser could apply for an Act 250 permit "in light of the existing improvements, facts, and circumstances that pertain to the lots." 10 V.S.A. § 6025(c)(2). The requirements of Act 250 generally are modified only to the extent needed to issue the permits. *Id.* Thus, Rule 60 specifies that a "complete application addressing all ten criteria of 10 V.S.A. § 6086(a) shall be filed by the qualified purchaser or purchasers seeking relief," and "[p]ermit decisions will be based upon consideration of the requirements of the criteria of 10 V.S.A. § 6086(a)(1)-(10), as well as existing improvements, facts, and circumstances of each case." Vermont Envtl. Bd. Rule 60(B), in 6 Code of Vermont Rules 12003001-39 (2001).

 Jipac has not shown that this special process would be of much assistance to Silas. The main impact of the "innocent purchaser" provision is to require the board to judge a subdivision in light of its conditions at the time the need for a permit is discovered rather than requiring the owner to seek approval for those existing conditions. In this case, there is no indication that the subdivided lots have been developed, so that the existing conditions at the time of the discovery of the need for a permit are the same as the conditions at the time of the sale to Silas. In these circumstances, the modification of the permitting requirements does not help defendants.

 Even if the "innocent purchaser" procedure was of assistance to defendants, we could not accept it as a remedy that displaced any private remedy between defendants and Jipac. There is nothing in the statutory language suggesting that the "innocent purchaser" provision was intended to be an exclusive remedy. More importantly, Silas purchased a subdivision that he understood to be exempt from Act 250

---

[3] It appears undisputed that Paul Silas was an innocent purchaser. In view of the findings of the environmental board, it is doubtful that defendants Currier or Roberts were innocent, as they were involved in financing other transactions pertaining to land held by a Netherland Antilles corporation.

regulatory review. But the determination that the purchase was not exempt from Act 250 jurisdiction changed the essence of what Silas purchased. In our view, Silas was entitled to evaluate the significance of that change before he purchased the land. Therefore, the "innocent purchaser" provision does not affect our evaluation under the *MacDonald* balancing standards.

We return then to the question of what remedy is appropriate for this case. We start by acknowledging that rescission is not ordinarily considered a remedy for an illegal contract. The traditional remedy is to leave the parties where the court finds them when the suit is brought. See *Pierce*, 51 Vt. at 561; see also *Montgomery v. Browder*, 930 S.W.2d 772, 778 (Tex. App. 1996) ("Courts are no more likely to help a party attempting to enforce an illegal contract than they are disposed in favor of the party who uses the illegality to avoid liability."). This remedy would, of course, work a significant forfeiture in this case. See *Yank v. Juhrend*, 729 P.2d 941, 944 (Ariz. Ct. App. 1986) (denying seller of property the ability to enforce promissory note and mortgage, based on failure to obtain a subdivision permit, would cause a forfeiture; presumption is against a forfeiture); see also Restatement (Second) of Contracts § 178(2)(b) (in weighing interest in enforcement of contract, account must be taken of any forfeiture that would result if enforcement were denied). Jipac would be unable to enforce the note, see *Pierce*, 51 Vt. at 562, or the mortgage based on the note, see *id.* at 563, allowing defendants to keep the land. Defendants would be unable to obtain restitution of the amount they paid on the note.

Even under our traditional law, however, the court's options for a remedy in this case are broadened because of the nature of the violation. See *Licking County*, 575 N.E.2d at 531 (courts will afford relief from illegal contracts "where equity requires it, to the more innocent party even after the agreement has been executed") (citation omitted). Although the instant transaction was made in violation of the law, it was Jipac's obligation to comply with the law. The statutory requirements are created for the protection of both the public generally and the purchaser. All of the information bearing on whether an Act 250 permit was required was known to Jipac. By arguing that Silas was an innocent purchaser, Jipac has conceded that Silas did not know that the subdivision and sale of the lots violated Act 250. Thus, only Jipac had the information from which to determine whether a permit was needed.

In traditional terms, the parties are not in pari delicto. See *Harrington v. Grant*, 54 Vt. 236, 239 (1881). That is, they have "very different degrees in their guilt" for the violation of the law. *Id.* at 240. In light of Jipac's obligation under the law to obtain the permit, defendants' ignorance of the facts necessary to determine the need for the permit, and the partial purpose of the law to protect buyers, the primary guilt for the violation of the law lies with Jipac.

In these circumstances, the innocent party may be entitled to restitution for any consideration given as part of the illegal transaction. See *Capo v. Century Life Ins. Co.*, 610 P.2d 1202, 1206 (N.M. 1980); see generally Restatement (Second) of Contracts § 198(b); 6A A. Corbin, Corbin on Contracts § 1540 (1962); II G. Palmer, The Law of Restitution § 8.6, at 202, 205-10 (1978). If the purchase and sales contract were unexecuted, but the buyers had made a deposit, we might go further than denying the seller the ability to enforce the contract. We might, in addition, order restitution of the deposit because of the differential culpability of the parties.

But here, the situation is more complicated. The contract is fully executed. The sales price of the property was $94,000 — $70,000 of which was reflected in the note and the mortgage to secure the note, and the rest was down payment. Presumably, the property is more valuable today, although the purchase price assumed no costs were necessary to comply with Act 250. Jipac's initial suit was for $70,000 plus unpaid interest. The trial court awarded defendants $80,259 in restitution, reflecting the down payment, interest and property taxes paid by Paul Silas, taxes paid by David Currier and Marcel Roberts, and interest on the other items.[4]

If we were to allow defendants to have restitution *and retain title to the property free of any claim by Jipac*, defendants would be unjustly enriched, and Jipac would suffer a forfeiture of its security interest. See II G. Palmer, *supra*, § 8.8, at 230-31. We do not believe that this harsh of a remedy is compelled by the nature of the wrong or the need to deter future illegality. See *Gallagher v. Leary*, 164 Vt. 633, 634, 674 A.2d 787, 788 (1996) (mem.) (allowing client to recover payments made to unlicensed architect and to keep benefit of architect's services was unnecessary "to effectuate the policy of [the] licensing" law); see also

---

[4] As indicated in footnote 2, the involvement of defendants Currier and Roberts in other financing contracts for sales of land from affiliated Netherland Antilles corporations may put them in a different position from defendant Silas with respect to the availability of restitution. Jipac has not, however, separately contested the restitution award to them or raised any issue here about the amount of the restitution award to defendants.

*Walsh v. Brousseau*, 815 P.2d 828, 832 (Wash. Ct. App. 1991) (key concern is "whether the court's decision will be likely to prevent the illegal transactions at issue from occurring in the future").

Rather, we believe that there are two remedy options which would be just in this case. The first would be to deny defendants restitution, but also deny Jipac recovery — that is, the traditional illegal contract remedy result. The second is to allow restitution to defendants, but to require defendants to retransfer the land to Jipac as a condition of restitution. Although the second option is less traditional, it is warranted in some circumstances. See *Venisek v. Draski*, 150 N.W.2d 347, 353-54 (Wis. 1967); see generally 8 S. Williston, Law of Contracts § 19:75, at 569 (4th ed. 1998) (in some instances "a sound public policy may demand either the enforcement of an executory illegal agreement, or the rescission of an executed one"); Restatement (Second) of Contracts § 198 cmt. b (restitution for person not equally in wrong is subject to restitution rules of §§ 370-377), § 372 (where specific restitution is granted, court can condition remedy "on return of ... anything that the party claiming restitution has received"). This alternative remedy is the equivalent of rescission. See 1 D. Dobbs, Law of Remedies § 4.3(6), at 614 (2d ed. 1993) ("Rescission is thus less a remedy and more a matter of the conceptual apparatus that leads to the remedy: the contract is being unmade, so restoration of benefits received under the contract seems to follow.").

We are mindful of, but reject, Jipac's argument that rescission is impractical because defendants failed to raise the need for a permit in a timely fashion and over ten years has gone by since the sale. See *Paradise Rest.*, 164 Vt. at 411, 671 A.2d at 1263. The lapse of time may be relevant to the nature of the remedy, but it cannot "somehow overcome the illegality of the contract itself." *In re J. Gus Lallande, Inc.*, 197 B.R. 406, 409 (D.P.R. 1996). Moreover, the remedy options and considerations here are different from those in *Paradise Restaurant*. The greatest part of the delay in this case was caused by Jipac's unsuccessful pursuit of a jurisdictional ruling from the environmental board and its appeal here.

In light of the amount of defendants' restitution award, it is unclear whether the rescission remedy is more or less advantageous to Jipac than denying any remedy to any party. The advantage of the restitution/rescission remedy is that it places the cost and risk created by the applicability of Act 250 on Jipac, where it properly belongs. Considering defendants' request for that remedy, we believe that under the unique circumstances of this case the court had the

discretion to order mutual restitution — that is, rescission — as the most practical response to the illegal conduct and the equities of the parties.

*Affirmed.*