2004 VT 12

# Merit Behavioral Care Corporation and Magellan HRSC, Inc. v. State of Vermont Independent Panel of Mental Health Providers, Austen Riggs Center and Jane Doe

[845 A.2d 359]

No. 02-271

Present: Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed February 6, 2004

*Craig Weatherly* of *Gravel and Shea*, Burlington, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Defendant-Appellee State of Vermont Independent Panel of Mental Health Providers.

*Robert D. Rachlin* and *David W. Gartenstein* of *Downs Rachlin Martin PLLC*, Burlington, for Defendant-Appellee Austen Riggs Center, Inc.

*Robert E. Manchester* of Manchester Law Offices, P.C., Burlington, for Defendant-Appellee Jane Doe.

¶ 1. **Dooley, J.** Merit Behavioral Care Corporation, a review agent that contracted with the State during the relevant time period to provide mental health care benefits to state employees, appeals the superior court's summary judgment order dismissing its complaint seeking to overturn an independent panel's decision that Merit should have provided coverage for state employee Jane Doe's mental health treatment at the Austen Riggs Center. Merit contends that the superior court erred in concluding that (1) Merit had a statutory obligation to provide prospective or concurrent review of Jane Doe's treatment at Austen Riggs, and (2) Merit had waived the right to deny medical coverage for Doe by failing to provide the required concurrent or prospective review. Merit also argues that the court erred in dismissing, without explanation, its breach-of-contract and indemnity claims against Austen Riggs. We affirm the superior court's grant of summary judgment to the State, but reverse the court's summary judgment ruling in favor of Austen Riggs and remand the matter for the court to consider, in the first instance, Merit's claims against Austen Riggs.

¶ 2. The State contracted with Merit to provide mental health care benefits to state employees under the State's medical benefit plan. By providing these benefits, Merit functioned as a "review agent" under 8 V.S.A. § 4089a(b)(4), thereby subjecting itself to the statutory requirements set forth in § 4089a. For its part, Merit contracted with Austen Riggs, a mental health care facility, to be one of its mental health care service providers under the State plan. Austen Riggs specialized in the care of seriously ill, treatment-resistant patients. Under its contract with Merit, Austen Riggs agreed not to seek compensation directly from a covered member for covered services, and to "cooperate actively" with

Merit's case management procedures, quality assurance protocols, and precertification and concurrent review procedures and policies. Austen Riggs also agreed to indemnify Merit "from and against any losses and expenses whatsoever arising from and to the extent attributable to any errors or omissions" by it in the provision of services under the agreement.

¶ 3. Jane Doe, a state employee covered under the State's plan, was referred to Austen Riggs in April 1997 for treatment of a long-term mental disorder. Doe was in the midst of a major depressive episode of the illness, which had proven to be resistant to various attempts at treatment over the years. After Doe's initial admission to Austen Riggs, a dispute arose between Merit and Austen Riggs over Doe's treatment plan. The conflict centered around inconsistencies between, on the one side, Austen Riggs' policy of having patients stay a minimum of thirty days at its Center once they were found to be appropriate candidates for treatment there, and, on the other side, Merit's policy of requiring daily review to ensure that continued residential mental health care services are medically necessary.

¶ 4. Shortly after Doe was admitted to Austen Riggs, Merit's medical director informed it that he could not conduct concurrent review of Doe's treatment because Austen Riggs' treatment plan did not fit Merit's method of managing in-patient treatment. The director noted that Austen Riggs did not share Merit's assumptions that "each day needed to be reviewed and a patient should be discharged or at least stepped down to a lesser level of care as soon as clinically indicated." Merit claimed that it had been misled about Austen Riggs' "willingness to work with our system of review and length of stay for admitted patients," while Austen Riggs countered that Merit knew of its policies, including its minimum-stay policy, when Merit contracted with it to be one of Merit's mental health care providers. In the end, Merit informed Austen Riggs that it would approve Doe's initial six-day stay and consider her claim for further treatment after retrospective review of her medical record.

¶ 5. Several days later, Merit informed Doe that it had authorized payment for her initial stay at Austen Riggs, but that "[b]ecause of differences between us and Austen Riggs regarding our standards for utilization review, we have pended the remainder of your stay." The gist of the letter was that Merit would determine the medical necessity of Doe's treatment after her discharge. Austen Riggs also sent Doe a letter stating that because Merit had declined its request "for further approval of medical necessity," she would have to pay for treatment herself if she

decided to stay at Austen Riggs. She agreed to do so, and remained at Austen Riggs for the next several months.

¶ 6. In December 1997, Doe sought reimbursement from Merit for her treatment at Austen Riggs. Merit denied Doe's claim because the available documentation did not support "the medical necessity of this level of care." Doe filed an additional claim for reimbursement in March 1998, which Merit also denied. Merit explained that the medical records submitted by Austen Riggs indicated that Doe's treatment failed to meet Merit's utilization management guidelines, and that there were no unique or special circumstances to justify departure from those guidelines.

¶ 7. In April 1999, Doe appealed to the Independent Panel of Mental Health Care Providers, a statutory body established to promptly consider adverse decisions made by review agents. See 8 V.S.A. § 4089a(c)(7). Following a hearing, the independent panel concluded that Doe's treatment at Austen Riggs was medically necessary and therefore covered under the State's plan. The panel found that Doe was in acute need of treatment because of her complete dysfunction and recent suicide attempts. The panel also found that long-term treatment at Austen Riggs was appropriate because Doe had previously failed to benefit from other treatment modalities, including short-term hospitalization, residential/day treatment, aggressive medication therapy, cognitive-behavioral therapy, and electroconvulsive treatment.

¶ 8. Merit sought review of the independent panel's decision in the superior court pursuant to V.R.C.P. 75, and added breach-of-contract and indemnity claims against Austen Riggs. The State, representing the panel, moved to dismiss Merit's complaint, and Merit cross-moved for judgment on the pleadings. The superior court denied the motions, but later granted summary judgment to both the State and Austen Riggs on the parties' cross-motions for summary judgment. The court concluded that as a "review agent," Merit was obligated to engage in "service review," which must be "prospective or concurrent with the [patient's] treatment." See 8 V.S.A. § 4089a(b)(4)-(5), (c)(5). Because the statute does not provide a specific remedy for a review agent's failure to conduct a concurrent or prospective review, the court analogized to insurance law. Drawing on *Reynolds v. John Hancock Life Insurance Co.*, 117 Vt. 541, 548, 97 A.2d 121, 126 (1953), the court concluded that Merit had a statutory duty to "speak" and make a coverage decision prospectively or concurrently with Doe's treatment. According to the court, by failing to make a decision, Merit waived any objections to Doe's request for coverage. The court also granted summary judgment to Austen Riggs

without discussing Merit's breach-of-contract and indemnity claims. This appeal followed the court's denial of Merit's motion to alter the judgment.

¶ 9. We review a grant of summary judgment using the same standard as the trial court. *Richart v. Jackson*, 171 Vt. 94, 97, 758 A.2d 319, 321 (2000). Summary judgment is appropriate when, taking all of the allegations made by the nonmoving party as true, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. *Id.*; V.R.C.P. 56(c). The nonmoving party is "entitled to the benefit of all reasonable doubts and inferences in determining whether a genuine issue of material fact exists," and the "facts bearing on the issue must be clear, undisputed or unrefuted." *Toys, Inc. v. F.M. Burlington Co.*, 155 Vt. 44, 48, 582 A.2d 123, 125 (1990).

¶ 10. Merit first argues that the superior court erroneously concluded that it had a statutory obligation to conduct service reviews prospectively or concurrently. According to Merit, the statutory provision mandating such review is not self-implementing, but rather requires the Commissioner of the Vermont Department of Banking, Insurance, Securities and Health Care Administration to promulgate a rule establishing this requirement. Merit maintains that because the regulation adopted pursuant to this provision does not reiterate the prospective-or-concurrent-review requirement, such review is not required. We disagree.

¶ 11. The provisions governing "mental health care services review" are set out statutorily. See 8 V.S.A. § 4089a. As a "review agent," Merit must perform "service review" activities, which include "reviewing the appropriate and efficient allocation of mental health care services" for the purpose of recommending or determining whether such services should be provided, reimbursed, or covered. See 8 V.S.A. § 4089a(b)(4)-(5). Under § 4089a(c), the Commissioner must adopt rules concerning specified statutory obligations, one of which requires a review agent to communicate with a patient's attending mental health professional before concluding that care rendered or to be rendered is inappropriate. 8 V.S.A. § 4089a(c)(5). That statutory provision explicitly states that "[t]he review shall be prospective or concurrent with the treatment." *Id.*

¶ 12. The regulation adopted by the Commissioner with respect to this provision requires a review agent to "communicate" with a patient's attending mental health care provider before determining that the care should be altered or is inappropriate, and that the review agent must notify the provider of an adverse decision within two business days of obtaining all of the information needed for the review. Regulation of Mental Health Care Providers (Regulation 95-2) § 7B(1), (6), 2 Code of

Vermont Rules 21 020 045-4, 045-5 (2000). The regulation, however, does not restate the concurrent-or-prospective-review requirement contained in § 4089a(c)(5), except with respect to emergency treatment. See *id.* § 7B(11) (a review agent shall "provide appropriate access for concurrent or prospective emergency care review during non-business hours if service review is conducted on emergency care").

¶ 13. We are not convinced that the Commissioner failed to perform her rule-making responsibilities under the statute, as Merit argues. The statute requires that the rules provide that "a determination by a review agent that care rendered or to be rendered is inappropriate shall not be made until the review agent has communicated with the patient's attending mental health professional concerning that medical care." 8 V.S.A. § 4089a(c)(5). The Commissioner adopted such a rule. The statute goes on to say that the review provided by the review agent must be "prospective or concurrent with the treatment." *Id.* The language is at least ambiguous as to whether the Legislature intended that the regulations also specify the nature of the review. Although it would have been preferable for the Commissioner to have explicitly restated the statutory requirement, the Commissioner apparently concluded that doing so was not a statutory requirement, and we must defer to the Commissioner's construction of the statute. See *Rock v. Dep't of Taxes*, 170 Vt. 1, 5, 742 A.2d 1211, 1215 (1999).

■ ¶ 14. Whether or not the Legislature expected that the prospective-or-concurrent-review requirement be part of the regulations, we hold that § 4089a(c)(5) obligates review agents to conduct their mental health coverage reviews consistent with this requirement. The obligation to provide prospective or concurrent review is clear and unequivocal and does not require further elaboration by rule. Merit correctly points out that the prospective-or-concurrent-review requirement is stated within one of ten paragraphs enumerating areas in which the statute requires the Commissioner to establish rules. The nature of the requirements in those ten paragraphs vary, however. Some require the exercise of discretion by the Commissioner, and thus have to be fleshed out in administrative regulations. See, e.g., 8 V.S.A. § 4089a(c)(2) ("A time period within which any determination regarding the provision or reimbursement of mental health services shall be made."); § 4089a(c)(4) ("The type, qualifications and number of personnel required to perform service review activities."). But others, like the prospective-or-concurrent-review requirement, are quite specific and thus do not need any further elaboration by regulation. The statute may not be artfully drafted, but it plainly requires prospective or concurrent review of

requests for mental health services coverage, and does not need a regulation to implement that requirement.

¶ 15. Moreover, while the regulation adopted by the Commissioner does not mirror the statutory language, we do not interpret its provisions to conflict with the clear statutory mandate. See *Delozier v. State*, 160 Vt. 426, 434, 631 A.2d 228, 232 (1993) (administrative body's interpretation of statutory provisions will be sustained on appeal absent compelling indication of error). Even if a conflict did exist, the regulation would not undermine the statutory requirement. See *id.* (to extent administrative rule conflicts with statute, rule cannot be sustained); see also *Martin v. State*, 2003 VT 14, ¶ 15, 175 Vt. 80, 819 A.2d 742 (administratively adopted regulations that compromise intent of authorizing statute will not be upheld). Hence, we conclude that Merit was obligated to perform its service review activities prospectively or concurrently with Jane Doe's treatment.

¶ 16. Determining the appropriate remedy for Merit's failure to meet its statutory obligation presents a more difficult question. The superior court concluded that, because Merit failed to make a coverage decision at the start of Jane Doe's hospitalization, it had "given up its right to challenge the appropriateness of Austen Riggs' regimen of treatment, and its obligation of payment therefor." The trial court found Merit analogous to an insurer, and explained:

> In the insurance context, our court has held that when there is a duty to speak, "simple fairness requires that the company should point out any defects in the proof of loss or claim therein if it would rely on them." *Reynolds v. John Hancock Life Ins. Co.*, 117 Vt. 541, 548 (1953), citing *Tyrell v. Prudential Ins. Co.*, 109 Vt. 6, 18 (1938). In *Reynolds*, our court held that silence by the insurer constituted a waiver of objections to coverage. Here, there was a statutory duty on the part of [plaintiff] as a review agent to speak — it is the duty to make its decision prospective or concurrent with treatment. "Pending" a decision is not an option. By having failed to make a decision, the review agent, being in a position analogous to an insurer, waived its objections to the request for coverage.

¶ 17. Merit argues that *Reynolds* provides an inadequate basis for summary judgment because the undisputed evidence does not establish the facts necessary for the rule stated therein to apply. Merit asserts that it did not "fail" to make a coverage decision at the outset of Doe's treatment; rather, in Merit's view, it was prevented from doing so by

Austen Riggs' refusal to cooperate with its established concurrent-review process. Merit further maintains that it was not "silent" in the face of a duty to speak; rather, it advised Austen Riggs and Jane Doe that it would withhold its determination of medical necessity until it could review Doe's treatment records.

¶ 18. We do not perceive any factual dispute preventing the superior court from granting summary judgment in favor of the State based on Merit's failure to provide the prospective or concurrent review required by § 4089a(c)(5). Whether or not Merit voluntarily relinquished its opportunity to review Jane Doe's treatment at Austen Riggs, it had no right to exercise that opportunity by "pending" its coverage determination. As the trial court held, placing Jane Doe's coverage determination in a file marked "pending" was not a lawful option for Merit. We have already concluded that § 4089a(c)(5) compels prospective or concurrent review. Merit cannot override this statutory mandate by notifying the patient or the medical provider of its intent, in effect, to violate the statute.

¶ 19. In discussing the appropriate remedy for Merit's statutory violation, the parties compare the common law doctrines of waiver and equitable estoppel. We have long recognized that waiver and equitable estoppel, though they have different elements, are often used interchangeably in insurance law. See *Liberty Mut. Ins. Co. v. Cleveland*, 127 Vt. 99, 102, 241 A.2d 60, 63 (1968); *Beatty v. Employers' Liability Assurance Corp.*, 106 Vt. 25, 31, 168 A. 919, 922 (1933). Regardless of which doctrine is applied in this case, however, Jane Doe should not, and cannot, be the one to assume the risks resulting from a statutory violation that arose out of a dispute between the mental heath care review agent and its own medical care provider. Whatever the outcome of that dispute, Doe should not be denied coverage for treatment that was not reviewed as prescribed by statute. Section 4089a(c)(5), which unequivocally requires prospective or concurrent review of mental health care services, is presumed to be incorporated into the contract between Merit and the State. See 2 L. Russ, Couch on Insurance 3d § 19:1, at 19-2 (1997) ("Existing and valid statutory provisions enter into and form a part of all contracts of insurance to which they are applicable . . . ."). Merit was obligated to abide by this statutory provision, and its failure to do so is sufficient to support a finding of waiver. In essence, the violation of the statute itself satisfies any requirement that Merit must have intended to waive its right to deny coverage. See *KPC Corp. v. Book Press, Inc.*, 161 Vt. 145, 148, 636 A.2d 325, 327 (1993) ("A waiver is a voluntary relinquishment of a known right."); cf. *City of Burlington v. Hartford Steam*

*Boiler*, 190 F. Supp. 2d 663, 679 (D. Vt. 2002) (where evidence supporting waiver is derived from insurance policy and correspondence between parties, issue "is ripe for summary judgment").

¶ 20. Merit contends, however, that equitable estoppel, rather than waiver, is the applicable principle in this case, and that estoppel cannot support the superior court's summary judgment ruling in favor of the State because there is an unresolved factual question as to whether Jane Doe detrimentally relied upon her right to prospective or concurrent review. Merit prefers an estoppel analysis because the doctrine's element of detrimental reliance requires a showing of prejudice, and there is support in Vermont case law for the proposition that an insurer is not estopped from disclaiming coverage for violating a statutory notice provision unless the insured can demonstrate prejudice. See *Cleveland*, 127 Vt. at 102-03, 241 A.2d at 63-64 (insurer's failure to abide by statute requiring confirmation of coverage with commissioner within fifteen days of notice of accident did not estop insurer from disclaiming coverage, given that insurer had timely notified parties and commissioner that accident was not covered under policy); see also *City of Burlington v. Arthur J. Gallagher & Co.*, 944 F. Supp. 333, 338 (D. Vt. 1996) (denying summary judgment because there was question of fact as to whether insured was prejudiced by insurer's alleged failure to respond to claims and to affirm or deny coverage within reasonable time, as required by Vermont's unfair trade acts provision).

¶ 21. Nevertheless, Merit fares no better when estoppel is assumed as the preferred approach in considering the appropriate remedy for the statutory violation. Detrimental reliance and prejudice must be presumed in these circumstances. The general statutory purposes for mental health care services review are to promote the delivery of quality, cost-effective mental health care; to enhance the effectiveness of clinical treatment; and to protect the patients, employers, and mental health care providers by ensuring that review agents are qualified to make informed decisions on the appropriateness of mental health care. 8 V.S.A. § 4089a(a). The specific provision in question was plainly intended to ensure that patients (and, to a lesser extent, mental health care providers) receive prospective or concurrent coverage decisions so that they can make fully informed choices on how to proceed. Cf. 14 L. Russ, Couch on Insurance 3d § 198:39, at 198-70 (1999) ("The obligation to timely issue adequately informative denials of coverage is generally intended to benefit the insured by means of providing sufficient information to allow the insured to evaluate alternatives and to do so at a time that is advantageous.").

¶ 22. Prejudice exists as a matter of law in this case because Merit's refusal to abide by the statutory mandate compelled Jane Doe to make a medical treatment decision without knowing whether coverage would be forthcoming, and we cannot know what her decision might have been had Merit made a timely decision to deny her claim. Cf. *Carr v. Peerless Ins. Co.*, 168 Vt. 465, 477, 724 A.2d 454, 461-62 (1998) (determining that appropriate remedy for insurance financing company's violation of statutory notice-of-cancellation provision is to declare cancellation ineffective, without getting into "expensive, difficult and ultimately speculative process of trying to determine what would have happened if the premium finance company had complied with the law"). By the time Merit ultimately denied Jane Doe's claim, it was too late for her to choose another treatment or to seek expedient review of the denial — options she would have had if Merit had complied with its statutory obligation. As the independent panel concluded, if Merit decided that Austin Riggs' care was inappropriate, "it follows that it was clinically indefensible for [Merit] to fail to provide her with an alternative."

¶ 23. Merit's failure to abide by § 4089a(c)(5) placed Jane Doe in the position of having to decide whether to pay for costly mental health care services without knowing whether her insurer would eventually reimburse her for the cost of those services — solely because the medical care services review agent and one of its participating medical care providers were engaged in a dispute over "standards for utilization review." As the independent panel found, the decision "produced considerable anxiety for" Doe. This is precisely the consequence that § 4089a(c)(5) was intended to avoid. Cf. *Jipac, N.V. v. Silas*, 174 Vt. 57, 64, 800 A.2d 1092, 1098 (2002) (allowing private remedy for statutory violation where offending conduct was plainly within area of Legislature's policy concern, such that denying remedy would seriously undermine intended policy); *State v. Gilman*, 173 Vt. 110, 117, 787 A.2d 1238, 1244 (2001) (exclusion of breath test was appropriate remedy for statutory violation because "[n]oncompliance with the statute produced exactly the situation the Legislature sought to avoid"). It is particularly important that those seeking mental health coverage are not placed in a position of uncertainty with respect to coverage. Unfortunately, mental illness often affects a patient's willingness to seek appropriate medical care to respond to the mental illness. The financial risk of losing insurance coverage adds another barrier to the pursuit of appropriate care.

¶ 24. Thus, the instant situation is qualitatively different from those presented in the cases cited by Merit. Here, as the result of Merit's actions, Jane Doe was deprived of the benefit the statute was intended to

confer. In contrast, in *Cleveland*, 127 Vt. at 103, 241 A.2d at 64, although there was a technical violation of a statutory notice provision, none of the parties involved in the dispute were affected by the violation because the insurer had already sent notices to them disclaiming coverage. The other case relied upon by Merit also centered around allegedly tortious after-the-fact claim-processing conduct. See *City of Burlington*, 944 F. Supp. at 338. There, the insured asserted that the claim-processing agent had engaged in an unfair insurance trade practice by not investigating and then affirming or denying coverage within a "reasonable amount of time," in violation of 8 V.S.A. § 4724(9)(B), (E). The court denied summary judgment because this assertion necessarily raised a factual question as to what amount of time was reasonable under the circumstances, which, in turn, depended to some degree on whether the insured had been prejudiced in any way. Neither case governs the situation here, where, as explained above, there was prejudice as a matter of law.

¶ 25. Generally, "where an insurer fails to provide a timely disclaimer of liability, the insurer is estopped to deny liability." 14 L. Russ, *supra*, § 198:58, at 198-98. Further, when a statute imposes a duty to disclaim coverage, and does not require a showing of prejudice, no such showing is required, unless the insurer is claiming that the terms of the policy are not applicable — in other words, in situations where the statute does not apply because the insurer has no duty to disclaim coverage. *Id.* §§ 198:59, 198:60, at 198-100-01, 198-103. For example, the New York Court of Appeals has determined, both in the context of no-fault and liability coverage, that an insurer's failure to disclaim coverage within an explicit statutory time frame precludes the insurer from later disclaiming coverage. See *Presbyterian Hosp. v. Md. Cas. Co.*, 683 N.E.2d 1, 4-5 (N.Y. 1997). The court concluded that the preclusion remedy, though not explicitly provided in the statute, was necessary to prevent frustration of the purposes of the statute, which were to avoid prejudice and risk to the insured resulting from unnecessarily delayed payments or disclaimers of liability. *Id.* at 7 ("Insurers simply have no precedential or statutory recourse to sit on their many procedural rights and requirements and then belatedly deny claims they should have acted upon earlier."); cf. *Jipac*, 174 Vt. at 64, 800 A.2d at 1098 (while statute does not explicitly provide private remedy for particular Act 250 violation, Legislature clearly established direct connection between violation and unenforceability-of-contract remedy).

¶ 26. The situation here, to an even greater degree, calls for a similar remedy. The statutory administrative penalties that the Commissioner may impose under 8 V.S.A. § 4087 (fines not to exceed $750 for

each violation and revocation of licenses for willful violations) are not specified as exclusive and are not directly responsive to the violation in this case. The only way to assure the effectiveness of § 4089a(c)(5) is to preclude insurers from disclaiming mental health medical care coverage in untimely and unauthorized retrospective decisions.

¶ 27. We are not persuaded by Merit's argument, accepted by the dissent, that Regulation 95-2 prevented it from acting at the time Jane Doe entered care, or shortly thereafter. In relevant part, the regulation requires the review agent to "communicate" with the provider before determining that the care is inappropriate, and to notify the provider of any adverse decision after obtaining all of the information needed for the review. Merit did communicate with Austen Riggs, and Austen Riggs informed Merit of its determination that Jane Doe was an appropriate candidate for treatment at the Center, which required a thirty-day minimum stay. We cannot agree with Merit that the regulation prevented Merit from acting on the information it had available and making a decision to deny or grant coverage of Jane Doe's treatment there. If Merit was not convinced that the provider had made a sufficient showing of medical necessity, Merit could have denied coverage, and Jane Doe would have had the opportunity to challenge that decision and obtain prompt review before the independent panel.

¶ 28. To the extent that Merit considered the information provided by Austen Riggs deficient for an effective review, its dispute was with Austen Riggs, not Jane Doe. Any problems Merit had with Austen Riggs' approach to long-term care should not have been resolved by putting Jane Doe in the position of not knowing whether she was going to obtain coverage for her treatment. As noted, the patient should not have to suffer the consequences of a statutory violation resulting from a dispute between the mental health services review agent and one of its providers.

¶ 29. We are also unpersuaded by the dissent's assertion that material issues of fact prevent summary judgment. The dissent has confused the requirement of communication contained in Regulation 95-2 with its view of the inadequacy of that communication. Merit knew that Austen Riggs did not intend to provide daily reviews of the appropriate level of care for Doe, and ultimately denied coverage on the grounds that Austen Riggs' failure to do so violated the "review criteria and standards" and "procedures and methods" established by Merit. See 8 V.S.A. § 4089a(c)(1).*

---

* The dissent disagrees with our statement that Merit ultimately denied coverage on the same grounds that it initially elected to pend its decision. As the dissent states, Merit's medical director informed Doe in May 1997 that Merit was pending its coverage decision

Under the dissent's analysis, the review agent could continue to ask questions and never make a concurrent review because it did not like the answers it received. Such a procedure would protect the review agent, but not Doe or others in her position, as the dissent claims.

¶ 30. Moreover, we find unavailing the dissent's claim that Doe should have appealed Merit's notice of its intent to delay its coverage decision — a claim never made by Merit. We doubt that the delay in rendering a decision was itself an "adverse decision," as described in 8 V.S.A. § 4089a(c)(7). In any event, the record before us demonstrates the inadequacy of such a remedy in response to a review agent's failure to render a timely, substantive decision. The period of care in dispute extended seven months until the end of November 1997. Doe sought reimbursement for the care in December 1997, and again in March 1998. Merit did not complete its internal review and reach its final decision until the end of January 1999. The independent panel did not render its decision until November 19, 1999, almost two years after completion of the mental health services in dispute. Although the statute describes the panel's review as a "prompt reconsideration," *id.*, it cannot be characterized as a prompt remedy for improper delay in rendering a decision.

¶ 31. Finally, we turn briefly to Merit's claims against Austen Riggs. In count two of its amended complaint, Merit sought a declaratory judgment that Austen Riggs was liable to Jane Doe for her treatment costs because Austen Riggs violated its contract with Merit by charging Doe directly and refusing to cooperate in Merit's utilization review process. In count three, Merit asserted, alternatively, that Austen Riggs was liable to Merit under the indemnification provisions of its contract for all benefits paid to

---

because of differences between Merit and Austen Riggs "regarding standards for utilization review." The meaning of this phrase is revealed in an April 30, 1997 letter from Merit's medical director to Austen Riggs' medical director, in which Merit explains that it could not do concurrent review of Doe's request because Austen Riggs "did not share our assumptions that each day needed to be reviewed and a patient should be discharged or at least stepped down to a lesser level of care as soon as clinically indicated." Merit's medical director states the same reasoning in a December 19, 1997 memorandum recommending no payment beyond the initial authorization period because "[t]here is no data that [Doe] received daily physician (psychiatric) review." Accordingly, in a March 30, 1998 letter, Merit's medical director informed Doe that her claim was being denied because Austen Riggs had failed to meet certain requirements established by Merit, including that patients be seen and evaluated on a daily basis by physicians. Moreover, the primary reason for the continued denial of Doe's claim provided by Merit's regional executive director and two other doctors hired by Merit during its internal review was that Doe had not been seen and evaluated on a daily basis by a physician. In short, the record before us demonstrates that Merit ultimately denied Doe coverage for essentially the same reason that it initially elected to pend its decision.

Doe as a result of Austen Riggs' breach of the contract. The superior court did not address these claims and did not provide any basis for its grant of summary judgment in favor of Austen Riggs. Because there may be material facts in dispute concerning these claims, we reverse the court's entry of judgment in favor of Austen Riggs, and remand the case for the court to consider, in the first instance, counts two and three of Merit's complaint.

*The superior court's grant of summary judgment in favor of the State in its May 22, 2001 decision is affirmed; the court's grant of summary judgment in favor of the Austen Riggs Center is reversed, and the matter is remanded for further proceedings consistent with this opinion.*

¶ 32. **Allen, C.J. (Ret.), Specially Assigned,** dissenting in part and concurring in part. Because I believe there is a dispute of fact as to whether Merit Behavioral Care Corporation had sufficient information to determine the medical necessity of Jane Doe's treatment concurrent with her stay at the Austen Riggs Center, I dissent.

¶ 33. As a review agent, Merit is charged with "reviewing the appropriate and efficient allocation of mental health care services" for the purpose of recommending or determining whether such services should be provided, reimbursed, or covered. See 8 V.S.A. § 4089a(b)(4)-(5). Pursuant to 8 V.S.A. § 4089a(c)(5), Merit cannot make a determination "that care rendered or to be rendered is inappropriate" until it "has communicated with the patient's attending mental health professional concerning that medical care." Regulation 95-2 implements this statutory requirement. See Regulation of Mental Health Care Providers (Regulation 95-2) § 7B(1), 2 Code of Vermont Rules 21 020 045-5 (2000) (A review agent must "communicate with the client's/patient's attending mental health care provider about mental health care and any relevant medical care provided or to be provided, before the review agent determines that the care should be altered or is inappropriate."). In making a coverage determination, a review agent is guided by written standards and criteria but it must "consider any unique or special circumstances of a client/patient before determining requested care is inappropriate." *Id.* § 7B(7)-(8). After a review agent has obtained "all information needed for the review[,]" it must notify a provider of an adverse decision within two business days. *Id.* § 7B(6).

¶ 34. In this case, the record shows that Merit informed Austen Riggs shortly after Doe's admission that it could not conduct a concurrent review of Doe's treatment because Austen Riggs' treatment plan did not fit Merit's method of managing in-patient treatment. Merit asserted that

it could not conduct a concurrent review in its usual manner because Austen Riggs did not share its assumptions that "each day needed to be reviewed and a patient should be discharged or at least stepped down to a lesser level of care as soon as clinically indicated." Consequently, Merit informed Austen Riggs and Doe that it would approve Doe's initial six-day stay and consider her claim for remaining treatment costs after retrospective review of her medical record.

¶ 35. Based on these facts, Merit argues on appeal that it was prevented from making a coverage determination concurrent with Doe's stay at Austen Riggs because Austen Riggs refused to provide it with the information necessary to conduct a proper service review. Merit asserts that it would have violated Regulation 95-2 if, in the face of Austen Riggs' refusal to communicate about Doe's treatment, it had nonetheless advised Austen Riggs and Doe that the proposed treatment was inappropriate.

¶ 36. The majority rejects this assertion and concludes that summary judgment was appropriately granted for the State. See *ante*, at ¶ 27. While acknowledging that a review agent must "communicate" with a treatment provider and make its decision only after it has obtained "all of the information needed for the review," the majority nonetheless concludes that Merit should have made its determination based on "the information that it had available." See *id.* According to the majority, Austen Riggs' acceptance of Doe as a patient and its requirement that she stay for a minimum of thirty days provided a sufficient basis to deny Doe's claim for coverage as medically unnecessary. See *id.* The majority suggests that if Merit considered this information insufficient, it should have nonetheless denied Doe's request for coverage and allowed her to challenge this decision before the Independent Panel of Mental Health Care Providers, a body that considers adverse decisions made by review agents. In this way, the majority asserts, it is protecting Doe from "suffer[ing] the consequences of a statutory violation resulting from a dispute between the mental health services review agent and one of its providers." See *ante*, at ¶ 28.

¶ 37. The approach endorsed by the majority undermines the goals of the mental health services statute and ignores the statutory and regulatory requirements imposed on Merit as a review agent. See 8 V.S.A. § 4089a(a), (c)(5); Regulation of Mental Health Care Providers (Regulation 95-2) § 7B(1), (6)-(8), 2 Code of Vermont Rules 21 020 045-5 (2000). Instead of protecting Doe and others like her, the Court's decision provides review agents with an incentive to deny requests for coverage whenever they lack sufficient information to make a coverage determination. This contravenes the requirements set forth in 8 V.S.A. § 4089a(c)(5)

and Regulation 95-2, and it conflicts with the Legislature's goal of fostering the practice of mental health services review as a "professional collaborative process" designed to enhance the effectiveness of clinical treatment. See 8 V.S.A. § 4089a(a)(2).

¶ 38. It is important to note that Merit's decision to "pend" its coverage determination was an adverse decision that Doe, Austen Riggs, or someone acting on Doe's behalf with her consent, could have immediately challenged through Merit's internal appeal process and through an appeal to the independent panel. See Regulation of Mental Health Care Providers (Regulation 95-2) §§ 3(A)1; 12-13, 2 Code of Vermont Rules 21 020 045-5, 21 020 045-8 (2000); 8 V.S.A. § 4089a(c)(7). An adverse decision is "a decision by a review agent not to certify or authorize payment for an admission, service, procedure or extended stay as requested by the client/patient, provider or representative of the client/patient." Regulation of Mental Health Care Providers (Regulation 95-2) § 3(A)1, 2 Code of Vermont Rules 21 020 045-5 (2000). In this case, Merit did not authorize payment for Doe's treatment concurrent with her stay at Austen Riggs, despite Austen Riggs' request that it do so. Had this decision been challenged, Doe would have known whether her treatment would be covered concurrent with her stay at Austen Riggs. This would have assured the effectiveness of 8 V.S.A. § 4089a(c)(5) and allowed the parties to avoid the predicament that concerns the majority. See *ante*, at ¶ 26.

¶ 39. The majority finds it "doubtful" that Merit's decision to pend coverage was an adverse decision within the meaning of 8 V.S.A. § 4089a(c)(7), and asserts that the record nonetheless demonstrates the "inadequacy of such a remedy in response to a review agent's failure to render a timely, substantive decision." See *ante*, at ¶ 30. I disagree. Austen Riggs justified its decision to demand payment directly from Doe on the adverse nature of Merit's decision to pend coverage. In its April 1997 letter to Doe asking her to pay for her own treatment, Austen Riggs asserted that "[a]lthough we requested further approval of medical necessity, [Merit] declined." Thus, it appears that, in Austen Riggs' view at least, Merit's decision to pend coverage constituted an adverse decision within the meaning of Regulation 95-2. At this juncture, Austen Riggs could have appealed Merit's decision rather than asking Doe to pay for her own treatment.

¶ 40. The majority does not explain why Merit should be punished for the amount of time that it took Doe to receive a final decision on her claim, particularly if one credits Merit's argument that it lacked sufficient information to make a coverage determination concurrent with Doe's treatment. The record shows that in December 1997 Austen Riggs

requested that Merit approve coverage for the costs of Doe's care. Merit rejected Austen Riggs' request in January 1998, asserting that Austen Riggs had already been paid by Doe, and Austen Riggs was an improper party to submit a claim. Doe and her family then submitted a claim, which Merit denied in March 1998 after concluding that the "available documentation does not support the medical necessity of this level of care." Merit conducted an internal appeal of its decision at Doe's request, and affirmed its denial of her claim in January 1999. In April 1999, Doe appealed to the independent panel, which conducted a hearing and issued its decision in November 1999.

¶ 41. The record shows that Merit acted in a timely fashion once Doe's request for reimbursement was filed. That it took the independent panel seven months to decide Doe's appeal should not be held against Merit. In any event, the majority does not explain how this delay demonstrates the inadequacy of a remedy that would allow Doe or Austen Riggs to challenge Merit's initial decision to pend coverage. An earlier appeal could have obviated much of the delay altogether.

¶ 42. I disagree with the majority that the undisputed facts establish that Merit ultimately denied Doe's claim on the same basis that it decided to pend coverage. See *ante*, at ¶ 29. In its May 1997 letter to Doe, Merit stated,

> [b]ecause of differences between us and Austen Riggs regarding our standards for utilization review, we have pended the remainder of your stay. We shall not be performing concurrent utilization review; however, following your discharge from their system of care, we shall review your medical record and determine insurance coverage following that review.

Merit ultimately denied Doe's claim for reimbursement in March 1998 after reviewing the medical information that she provided and concluding that the "available documentation does not support the medical necessity of this level of care."

¶ 43. As part of Merit's internal appeal process, two outside doctors reviewed Doe's claim and both recommended that coverage be denied. The internal appeals focused on Austen Riggs' failure to establish compliance with requirements necessary to establish the medical necessity of inpatient care. These requirements, as identified by Merit in a March 1998 letter to Doe, included the following: (1) a patient must be seen and evaluated by a physician within twenty-four hours of admission and seen daily thereafter; (2) there must be a thoroughly documented treatment record; (3) active discharge planning must be initiated at the

time of admission; and (4) daily assessments and active interventions must be completed by nurses, therapists, and physicians based upon the comprehensive treatment plan.

¶ 44. The first outside doctor recommended denial based on the absence of daily psychiatric follow-up. The second outside doctor, Dr. Susan Legacy, concluded that based on the available documentation, Austen Riggs' treatment of Doe did not meet the necessary requirements for acute treatment, nor did it satisfy requirements for long-term residential treatment. Specifically, Dr. Legacy found no evidence that the following requirements had been met: evaluation by a physician within twenty-four hours of admission; daily documented contact with a physician thereafter, and documentation of contact with staff for therapy, groups, etc., which included daily assessments and active interventions by staff; and initiation of active discharge planning near the time of admission. Dr. Legacy also expressed concern with Austen Riggs' general approach to treating Doe, explaining that Austen Riggs did not attempt to prevent Doe from becoming "hospital-dependent," nor did it address the regression that frequently accompanies such dependency. For these reasons, Dr. Legacy concluded that Doe's treatment between April and November 1997 did not meet "criteria for acute treatment at any level of treatment." Based on the absence of evidence that Austen Riggs had created a treatment program that would allow Doe to eventually progress to community-based treatment, Dr. Legacy did not find sufficient documentation to support authorization of Doe's treatment at Austen Riggs as long-term nonacute residential treatment.

¶ 45. The record indicates that Austen Riggs challenged Merit's assessment that its treatment of Doe failed to comply with Merit's guidelines. In a February 1999 letter to Merit, Austen Riggs asserted that Merit should reverse its coverage decision because it had complied with Merit's requirements for inpatient care, including the requirement that Doe be seen daily by a physician. Austen Riggs identified, and sought to rebut, the following additional reasons underlying Merit's denial of Doe's claim: it had not provided Doe with an individualized treatment plan; its treatment had not been delivered by qualified licensed professionals; and Doe had not received treatment in the most appropriate manner as provided by Merit's review criteria.

¶ 46. Thus, while the record reflects that Merit's review of Doe's claim for reimbursement focused on the application of Merit's utilization review criteria, the undisputed facts do not support the majority's assertion that Merit ultimately denied Doe's claim based solely on information that it possessed at the outset of Doe's treatment. Indeed, it seems unlikely that

Merit could legitimately base a "medical necessity" decision on the undisputed facts identified by the majority — Austen Riggs' acceptance of Doe as a patient and its requirement that she stay for at least thirty days. Among other factors, Merit must consider the unique or special circumstances of a client before determining that requested care is inappropriate. Thus, notwithstanding the fact that the treatment program provided by Austen Riggs was apparently inconsistent with Merit's standards for utilization review, Merit could not deny Doe's claim on this basis consistent with Regulation 95-2. In any event, I believe that it is for the factfinder, not this Court, to determine whether Merit possessed all of the information necessary to conduct a service review and make a coverage determination concurrent with Doe's stay at Austen Riggs. Therefore, I would reverse and remand the trial court's grant of summary judgment for the State for a determination of whether Merit had sufficient information to determine medical necessity.

¶ 47. I agree with the majority that the trial court erred in granting summary judgment for Austen Riggs and concur in that portion of the majority opinion. I am authorized to state that Justice Skoglund joins this dissent.