2011 VT 29

# Lang McLaughry Spera Real Estate, LLC v. Clark W. Hinsdale, III, and Suzanne G. Hinsdale

[35 A.3d 100]

No. 10-103

Present: Reiber[1], C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed April 7, 2011

Motion to Correct Record Granted April 28, 2011

---

[1] Chief Justice Reiber sat for oral argument but did not participate in this decision.

2

4

*Ross A. Feldmann* of *Gravel & Shea*, Burlington, for Plaintiff-Appellee/Cross-Appellant.

*James W. Runcie* of *Ouimette & Runcie*, Vergennes, for Defendants-Appellants.

¶ 1. **Dooley, J.** Clark W. Hinsdale, III, and Suzanne G. Hinsdale appeal from the trial court's summary judgment decision in favor of Lang McLaughry Spera Real Estate, LLC (Lang), in this contract dispute. The Hinsdales argue that they did not agree to pay Lang a commission on the sale of their berry farm business and business-related personal property items, in addition to a commission on the sale of their real property. They also assert that Lang violated the Vermont Real Estate Commission Rules and committed numerous acts of consumer fraud. Lang cross-appeals, challenging the court's award of attorney's fees. We reverse and remand the court's decision regarding Lang's commission and the court's award of attorney's fees. We affirm the court's judgment on the remaining claims.

¶ 2. The Hinsdales owned a fifty-six-acre parcel of land in Charlotte, Vermont, which contained a two-family residence and berry fields. They sold their berries commercially under the business name "The Charlotte Berry Farm," an unincorporated sole proprietership. In 2007, the Hinsdales entered into an "Exclusive Right to Market Property Agreement" with Lang. The listing agreement described the property by its street address only. The property was listed at $1,250,000, and the Hinsdales agreed to pay Lang a commission of 6% of the "sale price." In November 2007, the Hinsdales and a buyer entered into a purchase and sale agreement, which stated the total purchase price as $900,000. A December 2007 addendum broke down the total purchase price as follows: $725,000 — 81% of the price — for real estate; $100,000 for the business known as the "Berry Farm and Farm Stand"; and $75,000 for the business machinery, equipment, tools, fixtures, inventory and supplies.

¶ 3. At closing, Lang mistakenly calculated its commission as 5% of $900,000, or $45,000. The Hinsdales paid this amount, but refused to pay the remaining 1%, or $9000, after Lang found the mistake and requested the funds. The Hinsdales maintained that the listing agreement covered the sale of only their real estate, and not the sale of their business or business-related personal property. Since only 81% of the price was allocated to the real estate, and the Hinsdales had already paid 84% of the commission claimed by Lang, they argued that they had already paid more than was owed. Lang then sued the Hinsdales, seeking the remaining commission amount. The Hinsdales filed counterclaims, alleging that Lang breached the listing agreement, violated the Real Estate Commission Rules, and engaged in numerous acts of consumer fraud. The Hinsdales also raised Lang's alleged violation of the Vermont Real Estate Commission Rules as an affirmative defense to Lang's collection action.

¶ 4. The parties filed cross-motions for summary judgment, and in a December 2009 order, the court granted summary judgment to Lang. The court found the following facts to be undisputed. As noted above, the parties' listing agreement described the property by its street address only. Lang's analysis showed that the best way to market the property was as a country estate. The Hinsdales hoped that the buyer would continue the berry farm business, but this was not a condition of sale. In addition to the listing agreement, Lang contemporaneously prepared two multiple-listing-service (MLS) information sheets. These documents did not state that any equipment would be included as part of the property, although they described the property as a berry farm with various outbuildings and business opportunities. In mid-July 2007, Lang asked the Hinsdales what equipment might be included in the transaction, and the Hinsdales responded that it was negotiable. Clark Hinsdale stated his expectation that all of the Berry Farm specific supplies — such as scales, irrigation equipment, planters, rototillers, sprayers, and several tractors — would stay with the property. The Hinsdales also provided Lang with financial information about the business. The court found that Lang used all of this information to sell the property.

¶ 5. Lang also prepared marketing brochures for the property, which referred to the property as the "Charlotte Berry Farm." The brochures stated that the "Farm" consisted of "a farmstand-store, farm outbuildings and infrastructure, a 2-family log home, 2

ponds with an irrigation system, and approximately 56 acres with amazing views." They indicated that the "land produces blueberries, raspberries and strawberries in abundance," and referenced other possibilities for expansion such as a Christmas tree farm and cross-country skiing trails. The brochures provided that financial information was available to qualified buyers upon inspection of the property.

¶ 6. Lang secured a buyer for the property, and a purchase and sale agreement was executed in November 2007. The agreement stated that the equipment in the farm stand and the equipment listed in an attachment to the agreement would be transferred with the real property. The agreement included a handwritten provision that "buyer and seller to review + clarify all items + questions as per addendum (to follow) from Randy Amis, atty — to be in agreement w/ both parties." The parties then executed a December 2007 addendum, which imposed additional obligations upon the Hinsdales and allocated the purchase price between the real property, business, and equipment as set forth above.

¶ 7. With these facts in mind, the court examined the terms of the parties' agreement. Both parties argued that the term "sales prices" was unambiguous. According to the Hinsdales, the term referred only to the $725,000 allotted to the real property in the December addendum. Lang maintained that the term referred to the total price listed on the purchase and sale agreement. Looking to the plain language of the contract and the MLS forms, the court agreed with Lang. The court found that the circumstances surrounding the execution of the listing agreement reinforced its view that Lang had used its expertise to sell the "Charlotte Berry Farm," including the real estate, business, and equipment, and that this was the parties' intent from the outset. The court thus concluded that the Hinsdales owed Lang $9000 under the contract.

¶ 8. The court next considered the Hinsdales' arguments regarding the Vermont Real Estate Commission Rules. The Hinsdales asserted that there was no written agreement covering the business or the equipment, and thus, Lang could not collect a commission, either in part or at all, on the sale of that property. See Vermont Real Estate Commission Rule 4.12(c) ("A brokerage firm may only receive the compensation provided in . . . a written agreement signed by the firm and its client" and "shall not collect any compensation for brokerage services except as provided by

these rules").[2] They also argued that Lang had not included a clear description of the property in its listing agreement in violation of Rule 4.8(a)(2) (listing agreement must contain a "clear description of the property and its location").

¶ 9. The court rejected these arguments. As an initial matter, it observed that the Hinsdales failed to clarify how rules governing real estate transactions could be interpreted to apply to and require written agreements concerning the sale of the business and equipment as part of a real estate transaction. Even if the rules were applicable, the court found this case distinguishable from those where there were no written agreements whatsoever and thus a "total deficiency" in meeting a rule's requirements. It explained that the parties here had used a form agreement created by the Vermont Association of Realtors, and while the business and equipment were not mentioned specifically, the agreement itself did not undermine the purpose of the rules, which was "to establish fair dealings between parties, standardize the procedure and practices in the real estate business and to prevent fraud." *Green Mountain Realty, Inc. v. Fish*, 133 Vt. 296, 299, 336 A.2d 187, 189 (1975).

¶ 10. As to Rule 4.8(a)(2), the court found that the listing agreement made clear that a 6% commission would be paid on the sales price, which was initially set at $1,250,000. It concluded that the marketing of the property and the discussions between the parties regarding the Hinsdales' business and equipment demonstrated that Lang was selling the property as a working farm. Ultimately, the court found, Lang did procure the sale of the property as a whole, and even if the description of the property did not meet the requirements of the rule, this technical violation did not make it unfair for Lang to collect a commission on the sale. The court also granted summary judgment to Lang on the Hinsdales' consumer fraud claims, discussed in additional detail below. Based on its decision, the court awarded $29,333.03 in attorney's fees and expenses to Lang as the "prevailing party" pursuant to a provision in the parties' listing agreement. This appeal and cross-appeal followed.

¶ 11. We review the court's summary judgment decision de novo, applying the same standard as the trial court. *Richart v. Jackson*,

---

[2] We apply the rules that were effective April 1, 2002. The rules have since been revised, effective April 15, 2008. The language in former Rule 4.12(c) is now found in Rule 4.13(c); the language in Rule 4.8(a)(2) is now found in Rule 4.9(a)(2).

8

171 Vt. 94, 97, 758 A.2d 319, 321 (2000); see V.R.C.P. 56(c)(3) (stating that summary judgment appropriate where no genuine issue as to any material fact and any party entitled to judgment as a matter of law). We begin with the Hinsdales' arguments concerning the Vermont Real Estate Commission Rules because we find resolution of this argument dispositive. For purposes of this analysis, we assume, as the trial court found, that the listing agreement between Lang and the Hinsdales gave Lang authority to sell the Charlotte Berry Farm business, including all personal property. As discussed below, we conclude that Lang's noncompliance with the rules requires the denial of Lang's collection claim.

¶ 12. Real estate brokers and salespersons are regulated by statute. See 26 V.S.A. §§ 2211-2299. The regulatory authority is the Vermont Real Estate Commission, which is authorized to adopt rules "necessary for the performance of its duties." *Id.* § 2252(a). The real estate rules were adopted "to protect the public," *MacDonald v. Roderick*, 158 Vt. 1, 6, 603 A.2d 369, 372 (1992), and they "have the force and effect of law." *Fish*, 133 Vt. at 298-99, 336 A.2d at 189. Violation of the rules is unprofessional conduct. See 3 V.S.A. § 129a(a)(3). The rules require that services for a seller be delivered pursuant to "a written listing or seller service" agreement. Vermont Real Estate Commission Rule 4.7(a). We have recognized that listing agreements "ordinarily must comport with the duly adopted rules of the Vermont Real Estate Commission." *Moses v. Gagne*, 140 Vt. 43, 48, 433 A.2d 315, 318 (1981). In this case, Lang relies on its written listing agreement to recover a commission for the combined sale of real, business, and personal property. According to Lang, the agreement covered a "farm business," and the description of the property by its street address sufficed to show that the agreement encompassed the sale of real property, personal property, and a business. As to the real estate rules, Lang maintains that they are concerned solely with real estate, and there is no dispute that the actual real estate was adequately described here.

¶ 13. We do not read the Commission rules so narrowly. Lang alleges that it marketed the real property, the business and the personal property as one. Irrespective of the coverage of the personal property, the transaction falls within the scope of the laws governing real estate brokers and salespersons because it involves the sale of real estate. See 26 V.S.A. § 2211(a)(4)(G)

(defining term "real estate broker" to include one who "assists or directs in the procuring of prospects, calculated to result in the sale or exchange of real estate or any interest therein"). The Vermont Real Estate Commission Rules require that the listing agreement contain a "clear description" of the property covered by it. Rule 4.8(a)(2). In this case the "property" is both real and personal as the court found.

¶ 14. We recognize that Lang could sell the business goodwill and personal property without a real estate broker's license, or pursuant to a separate contract, and nothing in the statutory requirements or the rules states that they apply to sales of personal property. Lang chose, however, to use one listing agreement to cover both the real and personal property. Thus, the issue here involves the clarity of that one listing agreement that primarily covers real property. Under the consumer protection rationale of the rules, we find it impossible to separate the additional aspects of the contract between the broker and client from the real estate transaction. We particularly find difficult Lang's argument that, irrespective of the differences over the scope of the transaction, the contract necessarily includes the real estate and so there is no disagreement over that aspect.

¶ 15. Many of the terms of the listing agreement depend significantly on what property is covered by the agreement. For example, the agreement requires the property owner to pay a commission if the broker "presents an offer at or above the price stated herein." Whether this term is met depends upon the property covered by the offer. Similarly, the owner is required by the exclusive listing agreement to direct "all inquiries concerning this Property" to the broker. Whether this term would require referral of buyer interest in, for example, a tractor, depends on whether the tractor is within the covered property.

¶ 16. Although we have not addressed whether the Vermont Real Estate Commission Rules extend to all aspects of a real estate transaction, including those involving personal property, other courts have decided comparable questions, and their rulings and rationale support application of the Commission rules here. Cases where a broker is disciplined for unprofessional conduct as a result of professional activity that does not involve exclusively the sale of real estate provide a source of guidance. In *Hart v. Colorado Real Estate Commission*, the commission disciplined a real estate salesperson for misrepresentations made in connection

with a bridge loan the salesperson obtained for a seller who had listed property with the salesperson and was purchasing other property. 702 P.2d 763 (Colo. App. 1985). The salesperson argued that the bridge loan transaction was unregulated and, as a result, the discipline was beyond the commission's jurisdiction. The court rejected this argument reasoning that, "Hart's promise to obtain the loan was an integral part of the real estate transaction with the [clients]" and that the "[c]ommission may discipline real estate agents for related activities which do not require a license." *Id.* at 765.

¶ 17. A similar rationale was employed in *Rogers v. Division of Real Estate*, where a real estate broker was employed to find a house for a client with the additional challenge that certain personal property of the client had to be converted into cash to pay the down payment on the new house. 790 P.2d 102 (Utah Ct. App. 1990). The alleged misconduct related to the broker's sale of the personal property, and the broker argued that the personal property sales were unregulated and could not be the subject of discipline. The court rejected the argument, upholding the real estate commission's conclusion that the broker was acting as a real estate agent for the client over the entire period during which the broker sold the personal property: "Although the agreement between [the client and the broker] involved an unconventional means to find a home for [the client], the Commission's conclusion that [the broker] was acting as a real estate agent for [the client], and was thus subject to the rules of the Division, does not exceed the bounds of reasonableness and rationality.? *Id.* at 107. The discipline cases support the Hinsdales' view that the violation of the Commission rule with respect to business and personal property is nonetheless unprofessional conduct.

¶ 18. Another related situation arises where a business broker sells a business, but the overall transaction includes some real estate and the broker is not licensed to sell real estate. This situation occurs under law, applicable in virtually all jurisdictions, that denies a commission on a sale by an unlicensed broker. The commonly litigated issue is whether the broker is denied a commission solely on the real estate component of the sale or on

the other components as well.[3] As here, the broker argues that it should be able to obtain a commission on the personal property aspect of the sale because that part is unregulated and not subject to the jurisdiction of the regulatory authority.

¶ 19. The majority rule is that the broker is denied a commission for all aspects of the combined sale of the real estate and the business even though the real estate is only a small component of the property being sold. See *Lockridge v. Hale*, 764 S.W.2d 84, 87 (Ky. Ct. App. 1989) (collecting cases following majority rule); B. Burke, Law of Real Estate Brokers § 18.01, at 18-8 (3d ed. 2010) (majority rule is also called the Pennsylvania rule). It has been adopted by our sister court in New Hampshire. See *Blackthorne Grp., Inc. v. Pines of Newmarket, Inc.*, 848 A.2d 725, 731 (N.H. 2004). The New Hampshire Supreme Court decision specifically concluded that denial of a commission for all property was consistent with the language of the governing statute. See *id.*

¶ 20. A strong minority rule is that the broker may not obtain any commission unless the sale of the real property was merely incidental to the overall business sale.[4] See, e.g., *Bus. Brokerage Ctr. v. Dixon*, 874 S.W.2d 1, 6 (Tenn. 1994); *Thomas v. Daubs*, 684 N.E.2d 1011, 1014 (Ill. App. Ct. 1997). Both the majority and minority rule depend upon the rationale that the court views the transaction as a whole and the sale could not have gone through without the real estate component. *Thomas*, 684 N.E.2d at 1014; *Dubois v. Kepchar*, 889 F. Supp. 1095, 1104 (N.D. Ind. 1995). Both the majority and minority rule determining the commission remedy for unlicensed brokers reject Lang's argument that there should be no remedy with respect to the unregulated portion of a real estate transaction.

---

[3] This issue arises, as it is arising here, in states that have no separate regulatory scheme for brokers of businesses. The ideal solution would be for the Legislature to specify the responsibilities of brokers of businesses and all their components.

[4] There is another minority alternative which has apparently been adopted in three states, led by New Jersey. See *Kazmer-Standish Consultants, Inc. v. Schoeffel Instruments Corp.*, 445 A.2d 1149, 1152 (N.J. 1982); *Turnpike Motors, Inc. v. Newbury Grp., Inc.*, 528 N.E.2d 1176, 1178 (Mass. 1988); *Roberts v. Gaskins*, 486 S.E.2d 771, 777 (S.C. Ct. App. 1997). Under this alternative, the unlicensed broker can obtain a commission on the personal property portion of the sale if the price can be apportioned between the personal and real property. We acknowledge that this rule would support Lang's position in this case, but it has been adopted by only a very small minority of jurisdictions.

12

¶ 21. We conclude that Lang violated Real Estate Commission Rule 4.8(2) by failing to include a "clear description of the property" in the listing agreement. In reaching this conclusion, we interpret the "property" to include all property, real or personal, included in the listing agreement. Lang failed to describe the business and personal property that it had the exclusive right to sell.

¶ 22. Having decided that Lang violated the rule, we must decide what remedy, if any, flows to the Hinsdales from this violation. The Real Estate Commission Rules "reflect a public policy that may be used as a defense against a broker's enforcement of the listing agreement." *MacDonald,* 158 Vt. at 7, 603 A.2d at 372. We reached this conclusion after weighing the factors set forth in the Restatement (Second) of Contracts regarding the unenforceability of certain promises on public policy grounds. These factors include: the strength of the policy at issue; the likelihood that a refusal to enforce would further that policy; the seriousness of any misconduct involved and the extent to which it was deliberate; and the directness of the connection between that misconduct and the term of the contract to be enforced. *Id.* (citation omitted). We found this approach consistent with our case law. *Id.* (citing *My Sister's Place v. City of Burlington,* 139 Vt. 602, 613-14, 433 A.2d 275, 282 (1981) ("A contract whose formation or performance is illegal may be held void and unenforceable, but misconduct unrelated to the claim to which it is asserted as a defense will not invoke the doctrine" (citation omitted)). After weighing the considerations above, we held that "a violation of the rules of the Real Estate Commission with respect to the form or content of a listing agreement will bar recovery of a commission only if the violation somehow taints the agreement or makes its enforcement unfair." *MacDonald,* 158 Vt. at 7, 603 A.2d at 373.

¶ 23. In *MacDonald,* we found the violations at issue insufficient to meet this standard. The plaintiffs there complained of technical noncompliance with the rules, such as the broker's failure to use the precise words "exclusive right to sell" in the header of the listing agreement. 158 Vt. at 5, 603 A.2d at 371. The plaintiffs also argued that the broker failed to modify the listing agreement to reflect the modified termination date, although there was no dispute that the broker secured a purchaser within the appropriate period. In rejecting these arguments, we emphasized

that there must be a nexus between the asserted violation of the rules and the dispute between the parties, and there must be prejudice from the violation as well.

■ ¶ 24. By contrast, we held in *Bensen v. Gall* that a broker was not entitled to a commission for the sale of real property when he did not have a written listing agreement. 158 Vt. 106, 112, 605 A.2d 841, 844 (1992); see *Fish*, 133 Vt. at 299, 336 A.2d at 189-90 (reaching similar conclusion); see also *Currier v. Letourneau*, 135 Vt. 196, 200, 373 A.2d 521, 525 (1977) (concluding that where listing agreement did not contain signature of one of the owners of property to be sold and showed broker's commission in flat dollar amount rather than in percentage figure, agreement violated rules and broker could not recover damages for owners' alleged breach of contract for sale of real property). But see *Littlefield v. Lamphere*, 139 Vt. 77, 79, 422 A.2d 929, 931 (1980) (distinguishing *Currier*, and finding listing agreement complete and proper under rule and binding on husband, who had signed listing agreement expressly warranting that he was the owner of record of the property, even though the property was jointly owned with his wife). We have recognized that this particular violation of the rules will always result in a tainted or unenforceable agreement because "the requirement of a writing ensures that the parties are fully aware of the terms of the agreement." *MacDonald*, 158 Vt. at 7, 603 A.2d at 373.

■ ¶ 25. As stated in *Gall*, it is critical that parties memorialize the precise terms of their agreement before any real-estate services are performed, rather than attempting to work out the details at a later stage when the bargaining position of the parties may have changed. "This standardization of procedure ensures that consumers of broker services are fully informed and are treated fairly." *Gall*, 158 Vt. at 112, 605 A.2d at 844. To serve this goal, we found it fair to have the broker bear the risk of his or her failure to obtain a written listing agreement, and to apply "a prophylactic rule under which a broker without a written listing agreement cannot recover a commission." *Id.*; *Currier*, 135 Vt. at 200, 373 A.2d at 525 (stating that the law on the question is "unequivocal; a duly executed listing agreement is the sole vehicle upon which a broker can predicate recovery of any commission").

■ ¶ 26. The concerns that drove our decision in *Gall* are similarly implicated here. The parties agreed that Lang would act

as the real estate agent "for the listing, marketing and sale of the Property described in this Agreement." Lang claims that it was hired to sell a "farm business," but the only description of the property provided in the agreement is the street address of the real estate. If Lang believed or intended that this agreement also cover the listing, marketing, and sale of the Hinsdales' business and business-related personal property, it had the burden of stating so expressly. There is a strong public policy underlying the writing requirement set forth in the rules, and we further that policy by refusing to allow Lang to collect a commission on the sale of the business portion of the transaction here. See Restatement (Second) of Contracts § 178(3)(a), (b) (1981) (identifying such factors as significant in determining whether promise should not be enforced on public policy grounds). To hold otherwise would undermine the goals of forthrightness and consumer protection served by the rules. Equally as important, there is an obvious and close connection between the violation and prejudice to the Hinsdales, another important factor in weighing whether public policy should act to bar enforcement of a particular agreement. See *id.* § 178(3)(d). Indeed, the lack of clarity led to this dispute. See *Gall,* 158 Vt. at 112, 605 A.2d at 844 (wisdom of rule requiring written agreement illustrated by case in which dispute was "apparently caused, at least in part, by the absence of clear terms of agreement between the parties at the outset").

¶ 27. Thus, looking to the factors set forth in the Restatement and relied upon in *MacDonald,* we conclude that, given the absence of any specific agreement regarding the sale of the Hinsdales' business and business-related property, it would be unfair, inconsistent with the rules, and contrary to public policy, to allow Lang to recover a commission on this part of the transaction. See Rule 4.12(c)(1) (broker can only receive "the compensation provided in . . . a written agreement signed by the firm and its client"); see also *Jipac v. Silas,* 174 Vt. 57, 60-61, 800 A.2d 1092, 1095-96 (2002) (similarly weighing criteria set forth in Restatement in determining appropriate remedy for illegal conduct of contracting party); cf. *Geffen v. Moss,* 125 Cal. Rptr. 687, 693 (Ct. App. 1975) (invalidating and holding unenforceable that portion of sales contract that purported to convey goodwill of law practice, where such transaction was contrary to public policy set forth in rules of professional conduct). In other words, the undisputed facts support the application of the Hinsdales' affir-

mative defense to defeat Lang's collection action. See *MacDonald*, 158 Vt. at 7, 603 A.2d at 373 (violation of real estate rules will bar recovery of commission where violation taints agreement or makes enforcement unfair).

¶ 28. The Hinsdales argue that the remedy should go beyond denial of an additional commission on the business and personal property and should require Lang to return the commission paid on the real estate.[5] This argument is inconsistent with the "usual remedy for an illegal or unenforceable contract," which "is to leave the parties as the court finds them at the time the illegality is discovered." *Jipac*, 174 Vt. at 61-62, 800 A.2d at 1096. Lang's violation was in not including the business and personal property in the property description in the listing agreement. We conclude that the appropriate remedy is to deny it a commission on the omitted property, to the extent that commission has never been paid. That remedy is sufficient to enforce the policy behind the rule and respond to the harm caused to the Hinsdales.

¶ 29. Because we base our conclusion on the violation of the Real Estate Commission Rules, we find it unnecessary to reach the Hinsdales' remaining contract arguments. Even if we were to find the listing agreement to be ambiguous, or to unambiguously include only the real property, the remedy would be the same.

¶ 30. Given our conclusion, we also reverse the attorney's fee award. The listing agreement provides that "[i]n the event of any litigation or lawsuit between Owner and Listing Agency arising out of or relating to this Agreement, the prevailing party will be entitled to the costs and expenses thereof, including reasonable attorney's fees." The trial court's award of fees to Lang was based on the judgment for Lang on the merits, a judgment we have reversed so that Lang is not the prevailing party in seeking the remainder of its broker's commission.

¶ 31. It is a closer question whether the Hinsdales have become the prevailing party. They have prevailed on some of the remedies that they sought. The determination of which party, if any, is a prevailing party and entitled to an award of attorney's

---

[5] We acknowledge that the commission Lang has collected is slightly more than that attributable to the real estate. We conclude that the return of this small amount should be denied under the rationale in the text.

fees is entrusted first and foremost to the discretion of the trial court. See *Burton v. Jeremiah Beach Parker Restoration & Constr. Mgmt. Corp.*, 2010 VT 55, ¶ 8, 188 Vt. 583, 6 A.3d 38 (mem.) (stating that "identifying which . . . of the parties substantially prevailed . . . falls within the trial court's discretion" (quotation omitted)); see also *Fletcher Hill, Inc. v. Crosbie*, 2005 VT 1, ¶ 3, 178 Vt. 77, 872 A.2d 292 (stating that we review trial court's ruling on attorney's fees for abuse of discretion). We remand for the court to determine whether the Hinsdales are entitled to attorney's fees under the listing agreement, and if so, the amount of such fees.

¶ 32. We turn next to the Hinsdales' consumer fraud claims, all of which we find without merit. Vermont's Consumer Fraud Act (CFA) prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). To prevail on a CFA claim, one must show that: (1) there was a representation, practice, or omission likely to mislead the consumer; (2) the consumer interpreted the message reasonably under the circumstances; and (3) the misleading effects were "material, that is, likely to affect the consumer's conduct or decision with regard to a product." *Greene v. Stevens Gas Serv.*, 2004 VT 67, ¶ 15, 177 Vt. 90, 858 A.2d 238 (quotation omitted). We evaluate these elements under an objective standard. *Jordan v. Nissan N. Am., Inc.*, 2004 VT 27, ¶ 5, 176 Vt. 465, 853 A.2d 40. In an action for damages as a result of consumer fraud, the consumer must also demonstrate that he or she "sustain[ed] damages or injury as a result of any false or fraudulent representations or practices" of the violator. 9 V.S.A. § 2461(b); *Greene*, 2004 VT 67, ¶ 13.

¶ 33. The Hinsdales first argue that Lang misrepresented to them how it would allocate its commission in the event that the sale was procured by a buyer broker. According to Clark Hinsdale's deposition, he was told that the commission would be split 50/50 between Lang and any buyer broker. The listing agreement stated that the commission would be 6% "of the amount of the sale price." It authorized Lang to enter into agreements with other "brokers, salespersons or brokerage firms" to assist in marketing the property, but the compensation for that work would be established in Lang's "sole discretion." In fact, the multiple listing description, from Vermont Real Estate Information Network, Inc., showed both a broker agent and a buyer agent commission of 2.5%. It is unclear whether Clark Hinsdale read the

multiple listing description sheet. He learned that a buyer agent would receive 2.5% only after the closing had occurred. The distribution of the commission was never actually determined because Lang procured the buyer. Clark Hinsdale testified that the ·commission split was important to him because a lower commission percentage for the buyer broker could discourage some brokers from showing the property to their clients. The Hinsdales maintain that the court erred by looking to the terms of the listing agreement in reaching its conclusion, rather than focusing on whether Lang made a material and misleading statement.

¶ 34. We find no error, although we affirm on a basis different from that adopted by the trial court. As stated above, the standards for consumer fraud are objective to be judged from the standard of a reasonable consumer. The Hinsdales' claim, as they responded to the summary judgment motion, is based entirely on the deposition testimony of Clark Hinsdale, who was formerly a real estate broker himself. He testified that the commission split between the seller's and buyer's agent was "something that I took away from my years in the real estate business as being important." He explained that a seller's agent might give lower priority to selling a property with a 2.5% commission, the commission percentage specified on the MLS information, than to one that would earn a 3% commission or more.

¶ 35. The Hinsdales failed to show that any alleged "misrepresentation" was material to the reasonable consumer or that there was any damage or injury attributable to the representation that the commission would be split equally. Although Clark Hinsdale testified that he was upset with the commission split, there is no indication that the commission split affected the Hinsdales' decision to retain Lang. In fact, the evidence was that they listed their property with Lang based on their friendship with one of Lang's employees. Obviously, giving a greater percentage of the commission to Lang increased its incentive to market the property aggressively, on the theory espoused by Clark Hinsdale. There is no evidence that a reasonable seller of a small business would conclude that the greater incentive for the buyer broker was more important than a greater incentive for a seller broker. There was no evidence that the commission split affected the price for which the business was sold. We cannot

18

conclude that the Hinsdales put forward enough evidence to show a genuine issue of material fact on this claim of consumer fraud.

¶ 36. The Hinsdales next argue that the listing agreement falsely represented that Lang would mediate any dispute related to the listing agreement. The Hinsdales acknowledge that Lang agreed to attend a mediation session, but they assert that Lang made clear that it had no intention of mediating in good faith. As the trial court found, the parties' agreement stated that Lang "recommended" mediation. Such a recommendation, as the court concluded, was not likely to mislead a reasonable consumer into believing that mediation was guaranteed, and the Hinsdales' interpretation that they had a right to mediation was unreasonable as a matter of law. The Hinsdales raise no compelling argument to the contrary.

¶ 37. We similarly reject the Hinsdales' assertion that Lang had a "practice" of claiming a commission on property not included in a listing agreement, and that this practice violates the CFA. The Hinsdales offered no evidence that Lang engages in such practice. Their citation of a conditional statement made by Lang's president does not suffice. The fact that this listing agreement was not as specific as it should have been does not alone demonstrate consumer fraud.

¶ 38. Finally, the Hinsdales assert that Lang engaged in unfair and deceptive acts in trying to collect the claimed commission shortfall. According to Clark Hinsdale, Lang's president told him that any shortfall in the total commission would come out of the share of the Hinsdales' friend and Lang employee, Kathy Hale. Hinsdale clarified that Lang's president did not specify that *all* of the shortfall would come from Ms. Hale's share. The Hinsdales maintain that this was an unfair, coercive, and deceptive threat in an attempt to collect a debt. The trial court dismissed this claim because the events occurred after the transaction and could not have affected the Hinsdales' decision to enter into it. The court also noted that the alleged statement did not cause any injury to the Hinsdales because they refused to pay despite the statement. The Hinsdales argue that the statement represented an unfair debt collection practice prohibited by 9 V.S.A. § 2453(a) so the timing of the statement is not determinative. However, to collect damages from the unlawful act, they still had to show that they sustained "damages or injury" as a result of the violation of

§ 2453(a). See 9 V.S.A. § 2461(b). The undisputed facts show that they failed to do so.

*The judgment for plaintiff, Lang McLaughry Spera Real Estate, LLC, is reversed. The claim of defendants, Clark and Suzanne Hinsdale, for attorney's fees is remanded for consideration consistent with this decision. The remainder of the superior court's decision is affirmed.*

